THE A. C. & H. M. HALL REALTY COMPANY, Appellant, *v.* LEON SIDNEY MOOS, Respondent.

First Department, February 17, 1922.

Landlord and tenant — emergency Rent Laws — action for rent — defense that rent is unjust, unreasonable and oppressive — evidence — testimony of real estate men who were not qualified should have been disregarded — judicial notice of excessive cost of construction during abnormal period — when value of property cannot be proven by showing present cost of construction — testimony as to value based on present cost of construction not competent — opinion evidence as to fair rental improper — method of proving value suggested — proper items of cost of maintenance — when " obsolescence " and " depreciation " allowable — mortgages not to be considered in fixing fair return on investment — eight per cent fair net return — judgment properly reversed.

In an action to recover the rent for an apartment in New York city for a period during which the tenant held over without permission, wherein the defendant set up the affirmative statutory defense that the rent demanded was unjust, unreasonable and oppressive, testimony, as to the value of the premises, by expert witnesses who had had no experience in the sale of similar property in that locality but who merely expressed their opinion as to the value, was of no probative force and should have been disregarded.

The court will take judicial notice of the fact that during the past few years building materials and other factors which enter into building construction have been excessively high, and so the reproduction cost during such an abnormal period is not a fair test of property valuation for the purpose of fixing fair rental value under the emergency rent laws.

Accordingly, testimony by expert witnesses as to the value of the buildings in question, which was based on present cost of reproduction, should not have been taken into consideration by the court in fixing the value, as the testimony was based upon an erroneous theory.

It was improper to permit a real estate agent, though he had had many years' experience and was familiar with the renting of apartments in the neighborhood, to give his opinion as to what he thought was a fair rental where his testimony was based upon existing oppressive rentals, for to do so would be to usurp the functions of the court or jury under the emergency Rent Laws.

*It seems*, that where it can be shown that there was an existing market value of property before the period of abnormality set in, it would be proper to accept such proof on the question of present value, if competently given, taking into consideration at the same time the cost of the property when the owner purchased it or erected the building, its assessed valuation, actual *bona fide* sales of similar property in the vicinity, and such other facts and circumstances as may be pertinent in a given case, in order to fix the fair value for the purpose of determining a fair rental.

The landlord's income tax is not a proper item in the cost of maintenance of the property, nor should the cost of maintenance have been charged with the amount paid for sundries, as there was no proof as to what the sundries were.

While rental losses are a proper charge in connection with the expense of maintenance, there must be some proof offered showing past experience in respect of such losses, upon which an estimate of probable losses in the future may be fairly made, and as no proof was offered on that question, no estimate as to rental losses could properly be made by the court, and that item should have been eliminated from consideration.

The expense for telephone service paid by the landlord over and above the reimbursements therefor made by the tenants is a proper item in the cost of maintenance, but in the instant case it appeared that the landlord had been fully reimbursed and, therefore, no charge should have been made as to that item.

*It seems*, that " obsolescence " is not allowable in the case of a comparatively new fireproof apartment building.

While " depreciation " may be allowed, it was not satisfactorily established by the plaintiff that two per cent is a proper percentage therefor.

*It seems*, that in cases of this kind the return on the investment should be calculated upon the basis of the value of the property regardless of any mortgage thereon.

*It seems*, that eight per cent is a fair net return on the valuation of unincumbered property under existing circumstances.

The judgment in favor of the plaintiff, which was much larger than would be represented by a fair return based on a valuation justified by competent evidence plus the cost of maintenance correctly computed, was properly reversed.

PAGE, J., dissents.

APPEAL by the plaintiff, The A. C. & H. M. Hall Realty Company, from an order and determination of the Appellate Term of the Supreme Court, First Department, entered in the office of the clerk of the county of New York on the 9th day of June, 1921, reversing a judgment of the Municipal Court of the City of New York, Borough of Manhattan, Fifth District, in favor of the plaintiff, and directing a new trial. (See 115 Misc. Rep. 506.)

*Stotesbury & Miner* [*Louis W. Stotesbury* of counsel; *I. Maurice Wormser* with him on the brief], for the appellant.

*Goldman & Unger* [*Samuel Untermyer* and *William F. Unger* of counsel; *Samuel Rubin* with them on the brief], for the respondent.

*Lewis M. Isaacs, amicus curiæ*, on behalf of the Real Estate Board of New York.

GREENBAUM, J.:

Sixteen cases are involved in this appeal. They were tried together under a stipulation that the same evidence should be applicable to all of them.

The pleadings in all of the cases are substantially alike. The complaint alleges that the defendant was in possession of certain designated apartments in one of the two adjoining apartment houses located respectively at 251 and 255 West Ninety-eighth street, borough of Manhattan, under a written lease from the plaintiff, which expired on September 30, 1920, and that defendant wrongfully held over and continued in possession after the expiration of the lease without the permission of the landlord. Judgment was demanded for the reasonable value of the use and occupation of the premises at the rate of $250 per month.

The answer, in addition to a general denial, sets up the affirmative statutory defense that the rent is unjust, unreasonable and oppressive. The judgment awarded against the defendants in the sixteen cases covering the months of October, November and December, 1920, were from sixty to seventy per cent higher than the rents under their leases which expired on September 30, 1920.

It is the contention of the respondent that the evidence did not warrant the conclusions of the trial justice. A bill of particulars, as required by chapter 944 of the Laws of 1920, was filed by the plaintiff. The apartments under consideration are in two adjoining buildings known as 251–255 West Ninety-eighth street, which constitute one unit, and which are operated as a unit. The two buildings are substantially identical in size and character, excepting that on the roof of No. 251 is an apartment of four rooms and two baths described as a "pent house." All of the other apartments, with the exception of two of them, one in each building, which have five rooms and two baths each, consist of six rooms and two baths each. The assessed valuation of the two houses for the year 1920 was $400,000 and for the year 1921, $450,000. One of the properties is subject to a mortgage of $190,000, bearing interest at the rate of five and one-half per cent, and the other is free and clear of incumbrances. The bill of particulars alleges that the plaintiff purchased the land on which the buildings were erected at a cost of somewhat over $173,000, and that the buildings were constructed in 1913 under the supervision of the plaintiff at a cost of upwards of $349,000, making the total cost of the land and buildings somewhat upwards of $522,000. The actual operating expenses from October 1, 1919, to September 30, 1920, omitting interest on the mortgage and including water rates and insurance, agent's commissions and an item designated as "allowance for depreciation" of $7,944, are stated to have been $37,793.21. Adding thereto the sum of $9,920, the taxes for the year, total expense for maintenance would be $47,713.21. The total income from rentals for the same period is given as $74,885, thus leaving a

net income of $27,171.79. In the foregoing *résumé* we have omitted the item of interest on the mortgage, since we are of the opinion that the return or profit in this class of cases should be calculated upon the basis of the value of the property regardless of any mortgage thereon.

The bill of particulars also sets forth details of the estimated cost of maintenance and other deductions for the year commencing October 1, 1920, and ending September 30, 1921, which aggregate $87,976, and include interest on the mortgage and a number of items which were not embodied as items of expense for the preceding fiscal year. Deducting the item of interest on mortgage, the total estimated expense for the year ending September 30, 1921, would be $77,526, which is an increase over the preceding year of $29,812.79.

Upon the trial plaintiff assumed the burden of proving that it was entitled to largely increased rentals, owing to the increased cost of maintenance and the enhanced value of the property in October, 1921. The decision of the trial court does not disclose upon what findings of fact the judgments were predicated. It, therefore, becomes necessary to analyze the proofs for the purpose of ascertaining whether there was sufficient, competent and proper evidence to uphold the judgment.

The testimony in behalf of the plaintiff on the subject of the market value of the properties was given by four witnesses. One was a real estate agent having charge of a large number of apartment houses in the neighborhood where the property is located. Another was a real estate owner and agent, and the two remaining ones were real estate owners and builders. These witnesses were in substantial accord that the value of each building was about $300,000, and each lot about $100,000, making the total value of both properties $800,000, a sum nearly $300,000 more than the properties cost the plaintiff in 1913.

The testimony of the agent demonstrated that he was absolutely incompetent as an expert on present values. His testimony was not based upon any experience in cases of sales, but was simply an expression of his opinion. He constantly kept saying that the figures given by him were what he thought the properties were worth. In our opinion his testimony lacked any probative force, and should have been disregarded. Incidentally it may be said that this witness is a member of the firm which is the agency in control of other properties belonging to the plaintiff.

Another witness, who was both an owner and an agent, merely estimated the value of the buildings upon an arbitrary calculation of present cost of construction, without showing his qualifications,

based upon the cubical contents of the buildings multiplied by sixty cents per cubic foot, thus reaching a figure of about $400,000 as the value of each building, including the land.   He also testified that in 1913 the cost of construction was forty-two cents a cubic foot.

The third witness was a real estate owner and builder, who testified that he had purchased property in the neighborhood. His testimony on values was given as the result of computations of present cost of construction mentally made by him, based upon the amount of steel and plaster and the number of bricks and the quantity of excavation which he thought would be necessary in the construction of the building, without giving any details of quantity or prices.   He had made no written calculations.   His testimony on cross-examination as to the cost of construction in 1913 is as follows:   " Q. And you simply knew the general type of construction?   A. Yes.   Q. How much a cubic foot did the Hall building [meaning plaintiff's building] cost to build?   A. Well, we will say around sixty cents a cubic foot.   Q. In those days? A. Yes, sir.   Q. Did you hear Mr. Sharp testify here this morning that the cost of that building was forty-two cents a cubic foot? A. I heard him testify, but I didn't pay any attention; I don't know."

The remaining witness as to market value of the properties was a builder and owner, who had erected apartment buildings and who had purchased and sold buildings between One Hundred and Tenth and Seventy-second streets in the city of New York.   He testified on his direct examination that he had examined the buildings two days before he testified, and that in his opinion they would cost $312,500 to " build today " without carrying charges.   He gave it as his opinion that the value of the building and land today was $412,500 for each house.   When asked upon cross-examination if the figures he gave as to the value of these two buildings were the cost of replacement today, he answered, " If I were giving the value of those buildings at the cost today, they would be worth $550,000 apiece."   " Q. Didn't you testify just a moment ago, I think on direct examination, that the value of these buildings was three hundred and twelve thousand five hundred dollars, because of what it would cost to build them today?   A. No."   Counsel asked the stenographer to read the witness' testimony.   The witness then stated:   " If you want to know what I said, I said they would cost today $312,500 without carrying charges."   Then there was a question asked as to the value.   " Q. What do you mean by carrying charges?   A. The interest and taxes and other incidental expenses which are incurred during the construction of the building, such as the building loan operations, which amount

to quite a little." When asked what the carrying charges on the building during the time of construction would be, he answered " about $35,000 a building." It is quite apparent that the testimony of the witness was reckless. It is a matter of judicial experience that expert opinions of real estate values are of the most unsatisfactory character. Touching upon this subject in *Knoxville* v. *Water Co.* (212 U. S. 18) the court stated: " That most unsatisfactory evidence, the testimony of expert witnesses employed by the parties."

It is our opinion that the so-called opinion testimony given in this case as to the value of the properties was most unreliable in character and most unsatisfactory in every aspect.

The first witness to whose testimony we referred merely said what he thought the property was worth, regardless of any experience on his part in effecting sales or knowing of sales of similar property in the neighborhood. In the case of the other witnesses, their opinions, when probed, were not based upon any actual experience of sales, but upon present reproduction value of the property in question.

In *Brooklyn Borough Gas Co.* v. *Public Service Commission* (17 State Dept. Rep. 81, 98, 99) former United States Supreme Court Justice HUGHES, acting as referee, aptly observed in his opinion: " To base rates upon a plant valuation simply representing a hypothetical cost of reproduction at a time of abnormally high prices due to exceptional conditions would be manifestly unfair to the public." We may take judicial notice of the fact that during the past few years the excessively high price of building materials and other factors that enter into building construction work have discouraged the erection of buildings for dwelling purposes. Reproduction value during such an abnormal period is not a fair test of property valuation for the purpose of fixing fair rental values under the emergency Rent Laws. The natural law of supply and demand is not applicable to an abnormal period any more than would the law of supply and demand be favorably considered by the courts in justification of the existence of monopolies controlling the necessities of life. It is, of course, difficult to formulate an absolute rule for ascertaining the base upon which the fair rental return to the landlord is to be calculated, at a time when a fair market value is not ascertainable. It seems to us that, where it can be shown that there was an existing market value of property before the period of abnormality set in, it would be proper to accept such proof if competently given, taking into consideration at the same time the cost of the property when the owner purchased it or constructed the building, its assessed valuation, actual *bona*

*fide* sales of similar property, if any, in the vicinity, and such other facts and circumstances as may be pertinent in a given case, in order to fix the fair value of the property for the purpose of determining a fair rental.

The testimony in this case bearing upon the market value of the properties, aside from its inherently unsatisfactory character, was based on an erroneous theory, and hence has no probative force.

In addition to the abortive attempt to prove market value, there was testimony given in behalf of the plaintiff by a witness who qualified as a real estate agent of many years' experience, familiar with the renting of apartments in the neighborhood of the property in question, who testified as to what he considered was a fair rental for the premises in question.

Under the Rent Laws it devolved upon the court, or the jury in the event of a jury trial, to determine what a fair rental was. The Rent Laws were enacted to combat the " unreasonable " rents which the Legislature found were oppressively being exacted. To permit a witness to give his opinion as to what he thought was a fair rental based upon prevailing oppressive rentals would be to permit a usurpation of the functions of the court or jury. Besides the lack of competent evidence of values, the record discloses errors in the admission of items affecting the expenses for maintenance for the year ending September 30, 1921, to which respondent made objection. These are: *Pro rata* share in Federal and State taxes, $3,300; rental losses estimated at $5,864.50; telephone service at $1,250; sundries, $800, and salaries and office expenses, $10,000.

The items of Federal and State taxes refer to income taxes. Income tax is a tax on profits as such. We are here merely concerned with determining the profits to which the landlord is entitled upon the investment in the two buildings under consideration. The tribute that the landlord must pay to the government by reason of the income derived from the property in question and from other sources may not be foisted upon the tenant. The tenant, too, is expected to pay taxes to the government upon his income, but he is not required to contribute towards the payment of the landlord's income taxes. As to the item of rental losses, the case is barren of any proof showing the experience of the plaintiff with respect to such losses. Rental losses would be a proper charge in connection with the expenses for operating an apartment building. But there must be some proof offered showing the past experience in respect of such losses, upon which an estimate of probable losses in the future may be fairly made. The experience of rental losses is particularly important during a period when

housing facilities were restricted. Vacancies would necessarily be fewer under existing housing conditions than during a normal period. In the absence of evidence in the matter of vacancies no estimate as to rental losses could be made by the court, and that item, therefore, must be eliminated from consideration.

The item for telephone service of $1,250 paid to the telephone company was absolutely unwarranted for the reason that it was conceded by the landlord that the tenants more than repaid the actual money paid to the telephone company for the yearly service. The only proper charge in connection with telephone service would be the expense incurred by the landlord over and above the reimbursements therefor made by the tenants. But such evidence was not adduced upon the trial. As to the item of $800 for sundries, there was not the slightest proof as to what these sundries consisted of. The item of $10,000 for salaries was properly stricken out by the court, and it must be assumed that it was not taken into consideration by the trial court as an item of expense.

Among the " operating expenses " for the year ending September 30, 1920, there was an item in the bill of particulars for " allowance for depreciation " of $7,944, and in the statement of " estimated cost of maintenance " for the year ending September 30, 1921, there were the following two items: " 2% depreciation, $6,356.00; " and " 1% obsolescence, $3,178.00."

It seems to us that " obsolescence " was not allowable in the case of a comparatively new fireproof apartment building, for the reason that there was no evidence that such buildings were obsolete or were becoming obsolete in the locality in which they were. " Depreciation " is a different matter. Such an allowance would be proper; but the proof in this case that two per cent is a proper percentage for depreciation was not satisfactorily established. Thus we understand that the Federal government, in the enforcement of the Income Tax Law, has declared in the Income Tax Primer, issued by it in 1918 that " it has been estimated that the average usable lifetime of a frame building is 25 years, a brick building 35 years, a stone building or a steel and concrete building 50 to 100 years." We cannot, however, indicate any fixed rate of depreciation. That must depend upon proof in each case.

As heretofore mentioned, the estimated cost of maintenance from October 1, 1920, to September 30, 1921, was $87,976, from which should be deducted the items which we have criticized and disallowed, aggregating about $26,000, as also the item of interest on mortgage, amounting to $10,450, thus making the estimated cost of maintenance the sum of $51,506.

The judgment appealed from fixes the amount of the defendant's

rent in the instant case at $475 for three months, which is equal to an annual rental of $1,900. The annual rentals thus adjudged in the other fifteen actions are $1,000 for the " pent house," $1,800 for the five-room apartment occupied by the defendant Lichtenstein, and from $2,000 to $2,300 for each of the remaining five occupancies of six rooms. The adjudged rentals of the sixteen apartments aggregate $33,600, or an average of $2,100 for each apartment. The evidence is that there are fifty-five apartments in the two buildings consisting in all of 326 rooms. At an average rental of $2,100 per apartment, the fifty-five apartments would yield an annual gross rental of $115,500. Deducting from that figure the sum of $51,506, the established cost of maintenance, we find an annual profit of $63,994. If the value of the property be assumed to be $800,000, it would show substantially an eight per cent return. But, as pointed out, the evidence does not warrant any such valuation. Eliminating the incompetent evidence, a valuation of more than $523,250, the cost of the property in 1913, would not be justified. Even a lower valuation might be found, if we take into account the 1921 assessed valuation of $450,000 on both properties.

In this connection we would state that, in our opinion, in cases of this kind, the rental should be based upon the fair percentage of profits upon the fair valuation of the premises as though they were unincumbered by mortgages. It is true that upon that basis an owner of the equity therein would apparently receive a higher return upon his investment than the owner of an unincumbered fee. But so far as the tenants are concerned, the adoption of the method of calculation based upon an unincumbered fee valuation would result in the establishment of a fairly uniform scale of rentals of similar properties, and it would at the same time obviate the necessity of determining, in case of ownership of mortgaged premises, the cost of procuring loans, brokers' commissions and other charges and simplify the trial of this class of actions. We also think it might not be amiss to express our views as to what would be a fair percentage of return on fair value of the property under existing conditions. What such a percentage should be is not readily determinable. It would necessarily vary with market fluctuations of the rates of interest or returns on other classes of investments. There is, however, a limit which we believe impartial thinkers will agree should not be exceeded, giving due heed to prevailing financial and industrial conditions. It seems to us that the fair net return on the valuation of unincumbered properties under existing circumstances should be eight per cent.

Upon the basis of an eight per cent return upon an unincumbered

fee valuation of the property at $523,250, the landlord, upon the proofs in the instant case, would be entitled for the year ending September 30, 1921, to a net income of $42,580. To secure such a net income, the gross rentals must aggregate $94,086, which is reached by adding to the desired net income of $42,580 the estimated cost of maintenance of $51,506. Dividing the figure $94,086 by fifty-five, the total number of apartments in both buildings, we obtain an average rental of $1,700 per year. We have merely made the foregoing demonstration upon the admissible evidence for the purpose of establishing that the judgments appealed from were not justified.

In our opinion the judgments were properly reversed.

The determination of the Appellate Term must be affirmed, with costs, and judgment absolute rendered against the plaintiff upon its stipulation, with costs.

CLARKE, P. J., DOWLING and SMITH, JJ., concur; PAGE, J., dissents.

Determination affirmed, with costs, and judgment ordered against plaintiff upon its stipulation, with costs.