TROY HILLS VILLAGE, A PARTNERSHIP, *ET AL.*, PLAINTIFFS-APPELLANTS, v. TOWNSHIP COUNCIL OF THE TOWNSHIP OF PARSIPPANY-TROY HILLS AND TOWNSHIP OF PARSIPPANY-TROY HILLS, A MUNICIPAL CORP., DEFENDANTS-RESPONDENTS.

Argued May 27, 1975—Decided December 11, 1975.

608

610

*Mr. Lester P. Dubow* argued the cause for appellants (*Mr. Ralph W. Labendz,* of counsel and on the brief; *Mr. Dubow,* attorney).

*Mr. Bertram J. Latzer* argued the cause for respondents (*Mr. Latzer and Mr. Roy R. Claps,* of counsel and on the brief; *Messrs. Luther, Pendleton & Latzer,* attorneys).

The opinion of the Court was delivered by

PASHMAN, J. This appeal, which involves issues closely related to those decided today in *Hutton Park Gardens v. West Orange Town Council,* 68 *N. J.* 543 (1975) (*Hutton Park*) and *Brunetti v. New Milford,* 68 *N. J.* 576 (1975), concerns the constitutionality of the Parsippany-Troy Hills Township rent control ordinance. Plaintiffs, owners of virtually all the rental dwelling units in the municipality, attack the ordinance both as facially unconstitutional and as unconstitutional as applied.

In Morris County, a region of the State in which single family owner-occupied dwellings overwhelmingly predominate, Parsippany-Troy Hills is unique. It contains 7300 rental units in multifamily buildings, half the total number of rental units in the entire county. More than 45% of the

dwelling units in the municipality are garden apartments. Parsippany-Troy Hills experienced an enormous burst of apartment construction between 1962 and 1967, during which most of the present apartment stock was erected. There has been little new construction since 1967, and only two acres presently zoned for multifamily housing within the municipality remain undeveloped.

The municipality adopted a rent control ordinance, Ordinance No. 73.449, in April 1973. No public hearings or expert study of the local rental housing market preceded this action. That ordinance has since been amended three times (Ordinances Nos. 73.464, 73.472, 74.483), most recently in May 1974. In its present form, the ordinance declares the existence of a housing emergency, establishes rent charges in effect as of April 1973 as base rents, and limits rent increases over those rents to a fraction of the percentage increase in the Consumer Price Index (CPI)[1] during the preceding year calculated by applying to the increase in the CPI a formula set out in the ordinance[2] which gives earlier price

---

[1] *See generally, U. S. Dept. of Labor, Bureau of Labor Statistics, The Consumer Price Index: A Short Description* (1971).

[2] Section 2. Establishment of rents between a landlord and a tenant in all multiple dwellings shall hereafter be determined by the provisions of this ordinance. At the expiration of a lease or at the termination of the lease of a periodic tenant, no landlord may request or receive a percentage increase in rent which is greater than the percentage calculated by using the following formula:

Maximum percent increase 60 per cent (Consumer Price Index housing cost factor) X the weighted annual average by quarters of the Consumer Price Index increase.

The weighted annual average by quarters of the Consumer Price Index will be determined by taking the sum of the monthly percentage of the Consumer Price Index increase for each of the available quarters, January through March, April through June, July through September and October through December; and then by multiplying the fourth preceding available quarterly sum by 4; the third preceding quarterly sum by 3; the second preceding quarterly sum by 2 and the first preceding quarterly sum

fluctuations greater weight than later ones. The ordinance permits landlords, in addition, to pass tax increases through to tenants as rent surcharges but limits such surcharges to a percentage of the tax increase equal to the ratio of the square footage occupied by the tenant to the total square footage in the building and permits the tenant to pay such surcharges in 12 monthly installments. The ordinance also permits a landlord, in addition to the foregoing increases, to apply to the municipal rent leveling board for rent increases if he has made major capital improvements or improvements in services or for "hardship" increases if he cannot meet his mortgage payments and maintenance costs. By its terms the or-

by 1, and then by adding these values and dividing by the sum of 4. The maximum percentage increase will then be determined by multiplying this figure by 60 percent.

An example follows:

Effective date: February 1, 1974

Monthly C. P. I. increase, quarterly computation, weighting, and averaging annually.

| | | |
|---|---|---|
| Jan. | 1 percent) | (monthly C.P.I. increase) |
| Feb. | 1 percent) | 3 percent (sum of monthly C.P.I. increase percent) × 4 (weighting factor) equals 12 percent |
| Mar. | 1 percent) | |
| April | 1 percent) | |
| May | 1 percent) | 3 percent × 3 .......... equals 9 percent |
| June | 1 percent) | |
| July | 1 percent) | |
| Aug. | 1 percent) | 3 percent × 2 .......... equals 6 percent |
| Sept. | 1 percent) | |
| Oct. | 1 percent) | |
| Nov. | 1 percent) | 3 percent × 1 .......... equals 3 percent |
| Dec. | 1 percent) | |

÷ 4 30 percent

Annual average percentage increase .......... 7.5 percent

C.P.I. housing cost factor .................. × 60

Maximum percent increase ................ 4.500 percent

This formula results in an increase equal to 37.5% of the percentage increase in the CPI if the CPI increases at a steady rate. Applied to 1973 figures, the formula would permit rent increase of 3.46%.

dinance terminates after July 1975 unless extended beyond that date.[3]

Plaintiffs filed a complaint in lieu of prerogative writ in the Superior Court, Law Division in Morris County, challenging the ordinance on the grounds that the limitations upon rent increases were arbitrary, unreasonable and confiscatory, that the ordinance denied plaintiffs equal protection of the laws in that it imposed the same limitations on rent increases upon properties previously subject to multi-year leases as it did upon properties previously subject to single-year leases, and that no critical housing shortage existed in the municipality to justify such an ordinance. After hearing extensive testimony, the trial judge ruled for the defendant municipality on all issues except one.[4] Plaintiffs appealed and we granted certification on our own motion while the case was pending unheard in the Appellate Division. 67 *N. J.* 103 (1975).

I

*Substantive Due Process — Recital of Emergency*

We first consider plaintiffs' contention that no housing shortage that would justify municipal regulation of rents exists in the municipality.

---

[3]While the present case was pending before this Court, the Parsippany-Troy Hills Township Council adopted Ordinance No. 75:507 continuing rent control provisions in effect for an additional two years through July 1977.

[4]Ordinance No. 73:449, § 20, as amended by Ordinance No. 73:464, § 5, provides that its provisions may be extended beyond its expiration date by resolution of the township council. The trial court held that the provisions of the ordinance may be continued in effect only by adoption of a new ordinance, not by adoption of a mere resolution. *Accord, Albigese v. Jersey City,* 129 *N. J. Super.* 567, 569–70 (App. Div. 1974) ; *Barry Gardens v. Passaic,* 130 *N. J. Super.* 369, 380 (Law Div. 1974). In extending the ordinance in July 1975, the township did act by ordinance rather than by resolution. Ordinance No. 75:507. The issue has not been pressed by defendants before this Court and we express no opinion on its merits.

██ The burden is on the parties attacking the validity of a rent control ordinance to show that the legislative body could not have had any set of facts within its contemplation which would have permitted it to rationally conclude that the competitive rental housing market was not operating in the public interest. *Hutton Park, supra,* 68 *N. J.* at 564–565. Absent a specific statutory or constitutional requirement to the contrary, there is no obligation upon the municipality to hold special public hearings, or make any special study of the local rental housing market prior to adopting rent control ordinances. *Barry Gardens v. Passaic,* 130 *N. J. Super.* 369, 378 (Law Div. 1974) ; *cf. Ufheil Construction Co. v. Oradell,* 123 *N. J. Super.* 268, 269 (App. Div. 1973) ; *see generally,* 5 *McQuillan, Municipal Corporations* (3d ed. 1969), § 16.10 at 145.

The principal evidence offered by plaintiffs to carry this burden was 1) a survey of 10 apartment complexes in the municipality containing 3,956 rental units which showed that 539 units, approximately 39%, turned over in 1973 and projected a similar turnover rate for 1974, and 2) the testimony of the rental agent for Knoll Gardens, a garden apartment complex containing 1,108 units, to the effect that, despite a vigorous advertising program including daily advertisements in New York and Newark newspapers and large roadside billboards, the complex always had an average of 20 vacancies.

██ We note initially that the annual turnover rate, that is, the percentage of rental units that change hands per year, is principally a measure of the mobility of the population and is, at best, only an oblique indication of the state of the housing market. Thus the manager of Partridge Run Apartments, a complex with 247 units, testified on behalf of plaintiffs to the existence of a substantial turnover rate in his buildings but stated that his vacancy rate was near zero. Isolated evidence of the vacancy rates in particular apartment complexes likewise is of limited value in demonstrat-

ing the absence of a housing shortage. *Helmsley v. Fort Lee,* 362 *F. Supp.* 581, 594 (D. N. J. 1973). A high vacancy rate in a particular complex may indicate absence of a housing shortage; but it also may indicate poor management, substandard construction, undesirable location, or grossly excessive rent levels. *Cf. Parkview Village Associates v. Collingswood,* 62 *N. J.* 21 (1972). In general, proof of the absence of a housing shortage requires careful analysis of the housing needs and income levels of the various categories of persons who actively desire to live in the community and evaluation of the availability of rental units within the municipality suitable to the needs and financial capacity of those potential tenants. *Albigese v. Jersey City,* 127 *N. J. Super.* 101, 110–11 (Law Div. 1974), modified on other grounds, 129 *N. J. Super.* 567 (App. Div. 1974). Hence, even without more detailed evaluation of plaintiffs' evidence or consideration of the counter proofs tendered by the municipality, it is clear that plaintiffs have not borne their heavy burden of proof.

In actuality, the municipality has strongly supported the existence of conditions of housing shortage. John T. Chadwick, the municipality's expert, whom the trial judge found highly credible, testified that a vacancy rate of less than 3% is indicative of a serious housing shortage. In the 1970 census of housing, the federal government found the vacancy rate among rental units in Parsippany-Troy Hills to be 1.5%. Since then the population of the municipality has increased without any corresponding construction of new rental units. Two of plaintiffs' witnesses who testified as to the vacancy rates of particular apartment complexes reported vacancy rates of zero and 1.9%. Such evidence would surely have permitted the township council to rationally conclude that the competitive rental housing market is not operating in the public interest.

Plaintiffs urge in the alternative that any housing shortage that does exist is solely the consequence of the zoning policy of the municipality, which sharply restricts new con-

struction of multifamily dwellings. A shortage of this origin, they contend, should not be deemed a legitimate ground for imposition of rent regulation.

Given the unusual receptiveness of the municipality toward development of multifamily housing during the 1960's, it is somewhat difficult to credit the factual assertion that the present housing shortage is the consequence of restrictive zoning practices. Nevertheless, assuming the accuracy of this as a factual matter, the legal conclusion drawn by plaintiffs does not follow. Zoning is concerned with long-range housing problems; rent control with immediate ones. How a municipality has chosen to grapple with its long-term housing needs is irrelevant to the validity of its efforts to cope with its short-term problems. If plaintiffs believe that the Parsippany-Troy Hills zoning ordinance is illegally exclusionary and thereby contributes to the condition of housing shortage, they are free to attack that ordinance directly. They will not be permitted to employ the asserted illegality of the zoning ordinance to obstruct a municipality's otherwise legitimate efforts to cope with the immediate problems which the present state of the housing market poses for local tenants.

Finally, we note that although the existence of a serious housing shortage provides the most common factual basis for justifying the regulation of rents, there are other sets of facts from which a legislative body may rationally conclude that free operation of the housing market is not in the public interest. *Hutton Park, supra,* 68 *N. J.* at 564. Therefore, to sustain their burden of proof, plaintiffs must establish that there is no factual basis for the finding that rent control regulation is in the public interest.

## II

### *Substantive Due Process — Confiscation*

We have discussed claims that municipal rent control ordinances are facially confiscatory in the companion case of

*Hutton Park, supra.* While the Parsippany-Troy Hills ordinance differs in significant details from the ordinances considered in that opinion, none of those points of difference is such as to lead us to the conclusion that the ordinance at issue here is "so restrictive as to facially preclude any possibility of a just and reasonable return." 68 *N. J.* at 571.

Unlike the plaintiffs in the companion cases, the present plaintiffs allege that the ordinance is confiscatory as applied and have presented evidence in support of that claim. Jerold Goldberg, a certified public accountant, testified as to the financial condition of Cambridge Village, a garden apartment complex containing 130 units, identified by plaintiffs as a typical small garden apartment complex. In fiscal 1974, the gross income of the complex was $313,162,[4] an increase of 6.7% over the gross income of $293,460 received during fiscal 1973. Expenses for the fiscal year, excluding management fees and payroll to officers or interested parties,[5] were $178,212, an increase of 19.2% over the 1973 expenses of $149,516. No evidence was presented bearing on the reasonableness of these expenses, on the value of the complex or, most important, on the possibility that the net operating income did not provide a fair return on the owners' investment.

Jacob Weiss, a certified public accountant, testified as to the financial condition of Knoll Gardens, a garden apartment containing 1108 units, represented by plaintiffs to be a typical large apartment complex. In fiscal 1974,[6] gross income totaled $2,600,311, a 3.8% increase over the $2,503,707 fiscal 1973

---

[4] The figures testified to both by Goldberg and by Weiss were not audited figures. The accountants testified solely as experts explaining the financial significance of the figures given them by the owners of the property in question.

[5] It would appear that expenses did not include any allowance for depreciation.

[6] Knoll Gardens operates on a fiscal year running from March 1 to February 28.

gross income. Expenses for fiscal 1974, excluding officers' salaries, management fees, depreciation expenses, and state franchise and unincorporated business taxes, totaled $857,943, an increase of 24.6% over the 1973 fiscal year figure of $688,645. Once again there was no evidence as to the reasonableness of the expenses, as to the value of the apartment complex or as to whether the net operating income was a fair return on investment.

Although the subsidization of housing may be deemed a desirable or necessary response to social or economic ills, landlords cannot be compelled by municipal ordinances to subsidize the housing needs of their tenants. The legislative power to set rates does not give a municipality the "power to compel the doing of services without reward . . ." *Budd v. New York*, 143 *U. S.* 517, 547, 12 *S. Ct.* 468, 477, 36 *L. Ed.* 247, 257 (1892). As discussed in *Hutton Park*, *supra*, 68 *N. J.* at 565, a rent control regulation, to survive a constitutional challenge, must be nonconfiscatory as applied as well as nonconfiscatory on its face. The test for confiscation is whether the ordinance permits an efficient landlord to obtain a "just and reasonable" return on his property. *Hutton Park*, *supra*, 68 *N. J.* at 568–569.

We do not regard this appeal or the companion cases as the appropriate vehicle for a comprehensive or definitive formulation of the methodology for determining whether a landlord is receiving a fair return under a given rent control ordinance. The law concerning fair return in the context of rent control is still in its nascent stages. Moreover, in none of the cases decided today has the landlord sought to demonstrate the inadequacy of its net return. Consequently, the records before us are not suited to a full treatment of the question of fair return.

We further consider that from a procedural point of view it is highly desirable (though not mandatory) that municipalities enact, as part of their rent control ordinances, provisions under which landlords will be assured a just and reasonable return. These provisions should set forth standards

and criteria by which the parties, the local rent control agency and reviewing tribunals can be guided in determining the adequacy of returns actually received under the ordinance. *See, e. g., L.* 1953, *c.* 216, § 16(h) and *L.* 1966, *c.* 168, § 4(e). To say nothing more, for example, than that a landlord may seek relief if he cannot realize a reasonable profit from his investment would be inadequate since it fails to provide useful guidelines by virtue of which landlords can seek such relief. However, the courts are still the final arbiters as to whether a landlord is able to obtain a just and reasonable return under a rent control ordinance.

Therefore, in the interest of assisting tribunals in the resolution of future cases, we deem it appropriate to provide some guidance on the question of whether an ordinance is confiscatory as applied. Consequently, we set forth guidelines in more detail than would be necessary to resolve the particular issues raised by this appeal. We also examine some of the factors which should be considered in cases where landlords challenge a rent leveling ordinance as confiscatory. We do not, however, wish to imply that reliance on any one formula or method for determining the figures relevant to this question is mandated by this opinion. Therefore, our comments are intended to be general. We expect that as cases are litigated and records of expert testimony are fully developed, more information will become available to refine and, if need be, alter these guidelines.

We perceive that deciding whether a rent regulation permits a just and reasonable return requires consideration of the value of the rental property, the reasonable expense of operating the property, the income, the rate of return on the value of the property actually permitted by the rent regulation, and the minimum rate of return which would be just and reasonable for that property. Basically, this procedure involves two separate stages of calculations. First, the tribunal must make a factual finding as to the rate of return on the value of the property which the landlord will in fact receive under the governing rent leveling ordinance.

Second, the tribunal must make a factual determination as to that rate of return below which an actual rate of return would be confiscatory. This second determination can be designated as the "just and reasonable" rate of return on the value of a given rental unit. If the rate of return which the landlord actually receives falls below the just and reasonable rate, then the ordinance must be invalidated as confiscatory.

The general procedure for determining just and reasonable return is familiar to the law of public utilities. *Cf. Public Service Coordinated Transport v. State*, 5 *N. J.* 196, 216 (1950); *In re Intrastate Industrial Sand Rates*, 66 *N. J.* 12, 21–22 (1974); *FPC v. Natural Gas Pipeline Co.*, 315 *U. S.* 575, 584, 62 *S. Ct.* 736, 742, 86 *L. Ed.* 1037, 1048 (1942). *See generally, Garfield & Lovejoy, Public Utility Economics*, (1964); *Bonright, Principles of Public Utility Rates* (1961); *Kahn, The Economics of Regulation* (1970). To this extent utilities law may provide some guidance for our purposes. However, because of fundamental differences in the nature of the property involved and the purposes of the regulations, public utility precedents are of only limited value to the field of rent control. In particular, it should be noted that constitutional challenges to rent leveling ordinances are not rate-fixing cases. Courts should not be concerned with balancing competing interests and determining what is the "best" rate level. Rather, their sole task is to determine the lowest constitutionally permissible rate. That which follows is an examination of the various factors which should be considered in making this determination.

A. *Determination of the Rate of Return Which a Landlord Receives under the Ordinance*

In order to establish the rate of return actually being received under a given ordinance, one must deduct reasonable expenses from the gross rental income, and then cal-

culate the percentage relationship between the resulting "net income" and the value of the landlord's property.

█ *Value.* Valuation of the landlord's property is, of course, a critical step in determining whether a rent regulation is confiscatory in effect. *Cf. In re Intrastate Industrial Sand Rates, supra,* 66 *N. J.* at 21; *Public Service Coordinated Transport v. State, supra,* 5 *N. J.* at 217. We must take care, however, to define with precision what we mean by the term "value," because, as Justice Brandeis observed 50 years ago, "Value is a word of many meanings." *Missouri ex rel. Southwestern Bell Telephone Co. v. Missouri Public Service Comm'n,* 262 *U. S.* 276, 310, 43 *S. Ct.* 544, 554, 67 *L. Ed.* 981, 995 (1923) (Brandeis, J. concurring). *See generally,* 2 *Bonbright, Valuation of Property,* 1166–81 (1937). The meaning of the term must be derived from the purpose for which the valuation is being made. *FPC v. Hope Natural Gas Co.,* 320 *U. S.* 591, 601 n. 9, 64 *S. Ct.* 281, 287 n. 9, 88 *L. Ed.* 333, 344 n. 9 (1944).

Rent control begins with the premise that rents are being unfairly inflated as a result of failure in the free operation of the rental housing market — *e. g.,* housing shortages, monopoly power, etc. A standard of valuation which itself incorporates this failure will quickly defeat the purpose of rent control. Thus, valuation based on inflated rents would inevitably and erroneously lead the courts to a conclusion that a regulation which fails to permit such inflated rents is confiscatory. *Hall Realty Co. v. Moos,* 115 *Misc.* 506, 188 *N. Y. S.* 858 (Sup. Ct. 1921), aff'd 200 *App. Div.* 66, 192 *N. Y. S.* 530 (App. Div. 1923); 2 *Bonbright, Valuation of Property, supra* at 1104; *cf. I.L.F.Y. Co. v. Temporary State Housing Rent Comm'n,* 10 *N. Y.* 2d 263, 219 *N. Y. S.* 2d 249, 176 *N. E.* 2d 822 (Ct. App. 1961). Hence we employ the term "value" in the present context to refer to the value of the property in a rental housing market free of the aberrant forces which led to the imposition of controls. Where inflated rents are the result of a housing shortage, "value" refers to the worth of the property in the con-

text of a hypothetical market in which the supply of available rental housing is just adequate to meet the needs of the various categories of persons actively desiring to rent apartments in the municipality. This technique of hypothesizing a rental market with comparable levels of supply and demand has been utilized in English rent control legislation for several years.[7] "The Fair Rent," 115 *Solicitors' Journal* 496 (July 1971).

We do not pretend that such a valuation would fairly compensate an owner of residential rental property for permanent and total deprivation of the free use of his property. That, however, is not its purpose. Value in the present context is no more than a meterstick which the courts employ in measuring what rents a landlord is fairly entitled to receive. Justice Brandeis' position that "rate-making" value and "exchange" value serve different functions and need not coincide, *Missouri ex rel. Southwestern Bell Telephone Co. v. Missouri Public Service Comm'n, supra,* 262 *U. S.* at 289–311, 43 *S. Ct.* at 547–554, 67 *L. Ed.* at 985–995 (Brandeis, J. concurring), has long since become the law of the land. *FPC v. Hope Natural Gas Co., supra; FPC v. Natural Gas Pipeline Co., supra.*

Because value in the sense used here is to some degree hypothetical, it admittedly poses difficult problems of proof. Three methods are conventionally used for valuing real prop-

---

[7] Section 46 of Great Britain's Rent Act of 1968 provides:

*Determination of fair rent* — (1) In determining for the purposes of this Part of this Act what rent is or would be a fair rent under a regulated tenancy of a dwelling-house, regard shall be had, subject to the following provisions of this section, to all the circumstances (other than personal circumstances) and in particular to the age, character and locality of the dwelling-house and to its state of repair.

(2) For the purposes of the determination it shall be assumed that the number of persons seeking to become tenants of similar dwelling-houses in the locality on the terms (other than those relating to rent) of the regulated tenancy is not substantially greater than the number of such dwelling-houses in the locality which are available for letting on such terms.

erty: depreciated replacement cost, market value based on sales of comparable properties,[8] and capitalized income. *See generally, Encyclopedia of Real Estate Appraising* 10–16 (Freeman ed. 1968). The method of capitalized income is the one most commonly used in connection with apartment buildings. *Id.* at 197. Except under the most extraordinary market conditions, these three methods will not ordinarily lead to the same value. *Wendt, Real Estate Appraisal* 50–54 (1956). In the terminology of real estate appraisal, they must be "correlated," *i. e.,* adjusted for discrepancies which arise out of their differing theoretical bases and practical shortcomings as applied to the particular property in question. *Encyclopedia of Real Estate Appraising, supra* at 120–28.

None of these methods is wholly suitable to the problem of determining value in the present context. The capitalized income method begins with a prediction of future income and thus tends to become circular in the rate-making context. *FPC v. Hope Natural Gas Co., supra,* 320 *U. S.* at 601, 64 *S. Ct.* at 287, 88 *L. Ed.* at 344. To establish current "value" under this method, the appraiser supplies a *desired* "rate of return" as one element in his initial calculations. Because, in the context of rate regulations, the court will use the resulting determination of value to calculate the *actual* rate of return, the process exhibits circuitous reasoning. Market value based upon sales of comparable properties is sound only insofar as the comparable sales involve properties situated in a rental market that approximates the hypothetical rental market described above.[9] In addition, it may be misleading be-

---

[8]Valuation in the context of rent control differs from that in the context of public utility rate regulation in that, among other things, assets of public utilities are often essentially unique so that it is not meaningful to speak of their market value. Apartment buildings, on the other hand, are bought and sold all the time. It is meaningful to consider their market value, although that value may be difficult to ascertain with accuracy in any given case.

[9]One English Court recently noted, *inter alia*, that the sale value of comparable properties method must account for the existence of shortages in the rental housing market:

cause the current market value of rental housing depends in large measure upon the earning which can be derived from it. *Wilson v. Brown*, 137 *F.* 2d 348, 353 (Emer. Ct. App. 1943). The depreciated replacement cost method also may tend to be misleading when, as appears to be true at the present time, the high cost of construction is a major cause of housing shortages. *Cf. Southern Burlington Cty. NAACP v. Mt. Laurel Tp.*, 67 *N. J.* 151, 204–05 (1975) (Pashman, J. concurring). All of these methods, though, may shed light on the value of the property as the term is used here, once their deficiencies are recognized. In determining value, the court should take full advantage of the enlightenment which these methods of valuation may provide, as well as that provided by any other soundly conceived method which the parties and their expert witnesses may suggest such as assessed valuation or original cost depreciated. *Cf. Public Service Coordinated Transport v. State, supra,* 5 *N. J.* at 217.

 *Expenses.* The landlord is entitled to reasonable expenses including taxes and depreciation. These expenses may include, but are not limited to, expenditures for utilities, insurance, maintenance, reasonable repairs, depreciation for capital improvements, taxes, allowances for vacancies and uncollectibles, and depreciation on property. Frequently, a municipal rent leveling ordinance, as in the instant case, will permit landlords to impose direct surcharges on their tenants

---

'Where the rent of comparable properties has been registered within a year or two previous to the determination, the best evidence of the fair rent for a dwelling-house may be the rent registered for such comparable properties: the rent so registered will naturally have excluded any scarcity element. Where there is no comparable property or no rent for it has been recently registered the best evidence of the fair rent would seem to be evidence of the market rent for the type of dwelling-house less such percentage as appears to represent the scarcity element in the rent, if it is substantial. . . . A fair return on the landlord's capital investment may be a guide or check on rental values but it is by no means conclusive' — Woodfall on Landlord and Tenant, 27th.ed, vol. 2, para. 2674. [*Tormes v. Landau*, 3 W.L.R. 762, 766 (1970, Lord Parker, C.J.)]

to cover the cost of realty tax increases or increased services. To the extent that income from these surcharges reimburses the landlord for the cost of certain items, the surcharges should either be included in gross income *and* included as an operating expense *or* be totally disregarded, so that they are excluded from gross income *and* excluded from operating expenses. Naturally, during the examination of ordinances which do not contain such provisions, there will be no additional income from surcharges; however, the costs incurred by the landlord will be reported by the landlord as operating expenses.

 Finally, it should be noted that the constitution does not require that inefficient operators be permitted the same return as efficient managers. *Hutton Park, supra,* 68 *N. J.* at 570; *Permian Basin Area Rate Cases,* 390 *U. S.* 747, 769, 88 *S. Ct.* 1344, 1361, 20 *L. Ed.* 2d 312, 337 (1968); *Hegeman Farms Corp. v. Baldwin,* 293 *U. S.* 163, 55 *S. Ct.* 7, 79 *L. Ed.* 259 (1934); *Covington & Lexington Turnpike Rd. Co. v. Sandford,* 164 *U. S.* 578, 596–98, 17 *S. Ct.* 198, 205–06, 41 *L. Ed.* 560, 566–67 (1896). When an unreasonable expense has been incurred, the court should reject it and substitute a more reasonable alternative in its place. Plaintiff's books are, at best, merely prima facie evidence of expenses. They are always open to question for lack of reasonableness. *Cf. Public Service Coordinated Transport Co. v. State, supra,* 5 *N. J.* at 218.

 *Gross rental income.* In evaluating the income permitted by a rent leveling regulation, each individually administered apartment complex should be treated separately. A property owner will not be permitted to subsidize projects which yield an inadequate return out of his profits derived from other projects. Nor may the fact that one project is receiving more than an adequate return be concealed by averaging it together with projects bringing in lesser returns. Insofar as income is projected into the future, the landlord is entitled to reasonable deductions for vacancy rates due to

ordinary turnover, if they are not already accounted for as an operating cost.

B. *Determination of the Just and Reasonable Rate of Return*

The determination of the minimum rate of return which is constitutionally permissible is largely one of fact. There are a number of approaches which may be taken in determining the existence of such fair return. Examples may be found in statutes and regulations in this and other states and in the federal government over the years. See, *e. g., L.* 1953, *c.* 216, § 16 and *L.* 1966, *c.* 168, § 4(e), which fixed criteria for fair net operating income in terms of given ratios of net operating income to gross income of buildings of that class, and other factors. *See also British Rent Act of* 1968, Sec. 46, *supra.*

We leave to subsequent cases a fuller examination of the advantages and disadvantages of these methods. However, to assist the lower courts in resolution of future cases, we do set forth general guidelines to be followed when evaluating figures which various parties proffer as representative of the "just and reasonable" or constitutionally minimal rate of return.

In determining what is a "just and reasonable" return, the court must evaluate the interests of the consumer and general public as well as the interests of the landlord. *Hutton Park, supra,* 68 *N. J.* at 570 and cases cited therein. It is no objection that rental levels under the ordinance incidentally cause the value of the property to decline. *Hutton Park, supra,* 68 *N. J.* at 569; *Permian Basin Area Rate Cases, supra,* 390 *U. S.* at 769, 88 *S. Ct.* at 1361, 20 *L. Ed.* 2d at 337; *FPC v. Hope Natural Gas Co., supra,* 320 *U. S.* at 601, 64 *S. Ct.* at 287, 88 *L. Ed.* at 344. Furthermore, rent levels may permissibly work hardships on landlords in atypical cases, may drive inefficient operators out of the market and may preclude persons who have paid inflated purchase prices for buildings from recovering a fair return. *Hut-*

ton Park, supra, 68 N. J. at 570; Permian Basin Area Rate Cases, supra, 390 U. S. at 769, 88 S. Ct. at 1361, 20 L. Ed. 2d at 337; Hegeman Farms Corp. v. Baldwin, supra, 293 U. S. at 170–71, 55 S. Ct. at 9–10, 79 L. Ed. at 262–63; Covington & Lexington Turnpike Rd. Co. v. Sandford, supra, 164 U. S. at 596–97, 17 S. Ct. at 205–06, 41 L. Ed. at 566–67; N. J. Central Traction Co. v. Bd. of Public Utility Comm'rs, 96 N. J. L. 90 (Sup. Ct. 1921). However, to be "just and reasonable" a rate of return must be high enough to encourage good management including adequate maintenance of services, to furnish a reward for efficiency, to discourage the flight of capital from the rental housing market, and to enable operators to maintain and support their credit. A just and reasonable return is one which is generally commensurate with returns on investments in other enterprises having corresponding risks. On the other hand it is also one which is not so high as to defeat the purposes of rent control nor permit landlords to demand of tenants more than the fair value of the property and services which are provided. Cf. Permian Basin Area Rate Cases, supra, 390 U. S. at 792, 88 S. Ct. at 1373, 20 L. Ed. 2d at 350; FPC v. Hope Natural Gas Co., supra, 320 U. S. at 603, 64 S. Ct. at 288, 88 L. Ed. at 345; Missouri ex rel. Southwestern Bell Telephone Co. v. Missouri Public Service Comm'n, supra, 262 U. S. at 291, 43 S. Ct. at 547, 67 L. Ed. at 986; Public Service Coordinated Transport v. State, supra, 5 N. J. at 225. The rate need not be as high as existed prior to regulation nor as high as an investor might obtain by placing his capital elsewhere. Hutton Park, supra, 68 N. J. at 569–570; Covington & Lexington Turnpike Rd. Co. v. Sandford, supra, 164 U. S. at 596–98, 17 S. Ct. at 205–06, 41 L. Ed. at 566–67. As noted above, the task of the tribunal is to determine the lowest constitu-

---

[10]It should be noted that the rent control ordinances under consideration in this appeal and in the companion cases also decided today are not rate-fixing cases but merely establish price ceilings. Unlike public utility regulations in this State, they do not alto-

tionally permissible rate. There is no constitutional obstacle to a rent control ordinance which permits a higher rate of return.[10] The duty of the courts is limited to assuring that the ordinance does not oblige the efficient landlord to accept less.

Plaintiffs' proofs are almost exclusively concerned with periods prior to the adoption of the rent increase formula at issue in this appeal. This in itself does not render the attack premature. Where expenses and income can be projected forward with reasonable accuracy and the effects upon the rate of return of the regulation computed, property owners need not wait until they have already begun to suffer unjustly depressed returns before seeking judicial relief. The proofs themselves, however, are manifestly insufficient to sustain plaintiffs' heavy burden of proof. Plaintiffs have tendered no evidence with respect to the value of the properties in question. Their evidence of expenses was fragmentary and inadequately documented, and they have made no effort to prove what rate of return would be constitutionally required in the present context. On the record before the Court, plaintiffs' attack on the ordinance as confiscatory as applied must fail.

## III

### *Substantive Due Process — Arbitrary and Unreasonable*

The final question to be considered is whether the various provisions of the ordinance are so arbitrary and unreasonable as to violate principles of equal protection and substantive due process.

Plaintiffs contend that the rent increase formula violates principles of substantive due process in that it fails to permit landlords to pass through to their tenants all in-

gether displace the competitive market, they merely put an upper limit on its operations. As a consequence, the observation made in public utility cases that regulation which permits excessive rates of return is an unconstitutional abuse of the police power, just as is regulation which permits only inadequate rates, *e. g., In re Intrastate Industrial Sand Rates, supra*, 66 *N. J.* at 23–24, has no application to these ordinances.

creases in operating costs. The standards of judicial review under those principles are discussed in the companion case of *Hutton Park, supra,* and need not be repeated. The conceptual soundness of the particular fashion in which the municipality has used the Consumer Price Index and as to the wisdom of the regulatory policy which it has adopted,[11]

[11]The Consumer Price Index is a measure of fluctuations in the cost of living of the families of urban wage earners and clerical workers. It is widely used as a measure of the buying power of the dollar. The U. S. Bureau of Labor Statistics computes the index by calculating percentage price changes of a so-called consumer "market basket" consisting of 400 items commonly purchased by such families. It then weights the percentage price change for each item in accordance with the relative importance of that item in the spending of such families. The index consists of the average of these weighted percentage price changes. *See generally, U. S. Dept. of Labor, Bureau of Labor Statistics, The Consumer Price Index: A Short Description* (1971).

The rent increase formula employed by the municipality first reduces the annual percentage change in the CPI by 40%. The explanation given for this adjustment is that 40% of the weighted items in the "market basket" used to compute the CPI are not relevant to the cost of operating an apartment building. The intent — to obtain a more realistic measure of fluctuations in landlord's costs — is, of course, commendable, and, indeed, has been undertaken by the Bureau of Labor Statistics itself. *See, e. g., U. S. Dept. of Labor, Bureau of Labor Statistics, 1975 Price Index of Operating Costs for Rent Stabilized Apartment House in New York City* (1975). To accomplish this task, however, it is not sufficient to simply eliminate from the "market basket" those items which do not contribute to landlord costs. In addition, the remaining items (and any additional items necessary to obtain a representative landlord "market basket") must be reweighted in accordance with their relative importance in landlord's spending. The adjusted CPI employed by the municipality tends to systematically underrepresent fluctuations in the cost of operating rental housing.

The formula employed by the municipality then weights changes in the adjusted CPI over the preceding year so that increases which took place earlier in the year will contribute more to the formula than will changes which took place later. The explanation given for this adjustment is that it reflects the fact that landlords have actually had to pay for the earlier increases for a longer period of time than for the later ones. The effect of this adjustment is to change the rent increase formula from one intended to fairly enable the landlord to meet the operating costs of the coming year to one

is not pertinent to the constitutional challenge made to the ordinance. The constitution does not require that rent control ordinances take a particular predetermined form; nor does it oblige the municipality to permit landlords to uniformly pass their costs through to their tenants. The ordinance does not on its face purport to represent an effort to guarantee landlords more than the constitutional minimum. Precisely the same reasons which led us to reject the contention that the ordinance is confiscatory also lead us to conclude that it does not violate principles of substantive due process. *Hutton Park, supra,* 68 *N. J.* at 572–574. *Brunetti v. New Milford, supra,* 68 *N. J.* at 591–592.

Plaintiffs also attack this formula as violative of the equal protection clause of the fourteenth amendment to the federal constitution on the grounds that it fails to permit greater rent increases at the termination of multi-year leases than at the termination of leases extending over a single year. They contend that this irrationally discriminates against landlords who grant multi-year leases in that they are not permitted to pass on to the tenant rent increases reflecting increases in prices over the entire life of the previous lease. In reality, no landlord need have suffered injury insofar as the ordinance applies to multi-year leases granted after July 10, 1973, the effective date of the amendment to Ordinance No. 73:464 which requires that one-year and multi-year leases be treated the same. Such injury could have been avoided simply by not granting multi-year leases. This, according to the testimony of plaintiffs' witnesses, is the course which landlords in Parsippany-Troy Hills have in fact followed. The parties who do undoubtedly suffer some injury through the operation of this provision are the landlords who had multi-year leases in effect at the time of the enactment of that amendatory ordinance.

closely linked to his cost increases over the preceding year. This linkage builds into the formula the very "regulatory lag" which other regulatory agencies have been struggling to eliminate. *E. g., State v. N. J. Bell Telephone Co.,* 30 *N. J.* 16, 28 (1959).

 In evaluating this allegation, it is well to remember that legislative bodies have broad discretionary powers in making legislative classifications:

> Equal protection is not denied because a regulatory statute might have gone farther than it did, or might have included some persons or classes of persons who were excluded. Regulatory need in a particular field may appear to the legislative mind in different dimensions and proportions; as more acute in one area than in another. Consequently the reform may proceed one step at a time, addressing itself to the aspect of the problem which seems the most pressing.
> \* \* \* \* \* \* \* \* \*
> \* \* \* In short, equal protection does not demand immediate logical tidiness; nor is it violated because the legislation as enacted does not bring about the full reform or result intended to be produced. In an area of many competing pressures the constitution is satisfied if the Legislature, in responding to what it conceived to be living facts calling for regulation, did not disregard reason in drawing its lines. That those lines might have been drawn more suitably in light of the whole problem is not a matter for judicial re-examination. Classification is a perennial and difficult problem, capable of no doctrinaire solution. [*N. J. Chapter, American Inst. of Planners v. N. J. State Bd. of Professional Planners*, 48 *N. J.* 581, 602 (1967), appeal dismissed 389 *U. S.* 8, 88 *S. Ct.* 70, 19 *L. Ed.* 2d 8 (1967)]

*Accord, Pleasure Bay Apartments v. Long Branch,* 66 *N. J.* 79, 93–95 (1974); *Dandridge v. Williams,* 397 *U. S.* 471, 486–87, 90 S. Ct. 1153, 1162–63, 25 L. Ed. 2d 491, 502–03 (1970). To overturn a classification on equal protection grounds, plaintiffs must demonstrate that the township council could not rationally have concluded that the classification would advance a legitimate legislative end. Absent proof to the contrary, we cannot say that the municipal governing body could not rationally have concluded that base rents of apartments subject to multi-year leases as well as those subject to one year were sufficiently high that no landlord would be excessively harmed by adopting the administratively convenient course of applying the same standard for rent increases to both.

The judgment of the Law Division is affirmed.

CONFORD, P. J. A. D., Temporarily Assigned. (concurring). I join the opinion of the court to the extent that it decides the specific case before us and explains how it does so. I also agree thoroughly with the suggestion that municipal rent control ordinances should fix criteria and guidelines for determination of complaints of landlords that the regulations deprive them of a fair return. I do not join that portion of the opinion which discourses *in extenso* upon how a rent control board or court is to, or may, determine whether the rent regulations are depriving a landlord of a "just and reasonable" or "fair" return on his property in the absence of provisions therefor in an ordinance. Neither the instant plaintiffs nor any of those in the companion cases undertook either at trial level or on appeal to prove or even assert that they were deprived of a fair return. Thus, an extended exploration of the complex question of fair return, beyond the unexceptionable assertions that the landlord may not be deprived of it, and the ordinances should deal with it, is extraneous to the appeal and the record as presented; and to dwell on it on a purely theoretical basis does not, in my view, serve any tribunal which may someday face the question, but may rather tend to confuse it.

I have particular objection to the court's observation "that deciding whether a rent regulation permits a just and reasonable return *requires* consideration of the value of the rental property, the reasonable expense of operating the property, the income, the rate of return on the value of the property actually permitted by the rent regulation, and the minimum rate of return which would be just and reasonable for that property" (emphasis mine). This is the jargon of adjudication for public utility rate purposes, as evidenced by the cases in that field cited by the court. It seems to me that the court is implying that that method will be the general rule for rent control administration, with its detailed supporting explication as to methodology. This is plainly inconsistent with the court's separate observations that "public utility precedents are of only limited value to the field

of rent control" and that it does not "regard this appeal
* * * as the appropriate vehicle for a comprehensive or
definitive formulation of the methodology for determining
whether a landlord is receiving a fair return under a given
rent control ordinance." My view is that both in theory
and practice public utility rate cases have minimal utility
for this purpose and should not be discussed in this case. Indeed the whole search for "value" in this context becomes
circular, since, as the court's opinion itself points out, apartment house value is normally approached on the basis of
capitalization of net income, whereas the very purpose of
the rent control agency, when the issue is raised, is to determine the fair rent on which the net for valuation purposes would be predicated.

Were it appropriate in these cases to get into the subject
at all, I would submit that a local rent control agency of
typically inexpert part-time people, operating under the rudimentary kinds of ordinance before us here — which unfortunately prevail today — see *Inganamort et al. v. Bor. of
Fort Lee et al.*, 62 N. J. 521, 538, 544–545 (1973) (dissenting opinion), needs simple, practical and inexpensively administrable rules, such as, for example, those provided for
determination of fair return by L. 1953, c. 216,[1] the last general rent control statute in this State. Such an agency
would be ill-served by resort to the complex, cumbersome,
expensive, and, I think, largely irrelevant techniques, procedures and theoretical bases of the public utility rate field.

The court's opinion is useful in suggesting the *availability*
of a variety of criteria and guidelines (other than public
utility) for fair return purposes, but I would stop there in
this particular case and not specify a preferred approach,
especially that advanced by the court.

---

[1]Section 16(h) provides for presumptively fair ratios of net operating income to gross income. See also L. 1966, c. 168, Section
4(e).

Justice CLIFFORD joins in this concurring opinion.

CLIFFORD, J., and CONFORD, P. J. A. D., concurring in the result.

*For affirmance*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIIFFORD and SCHREIBER and Judge CONFORD—7.

*For reversal*—None.