**COPPERGATE SENIOR CITIZENS TENANTS ASSOCIATION, an Unincorporated Association, et al.**

v.

**James LYNN, In his official capacity as the Sec. of Dept. of Housing & Urban Development (HUD), et al.**

**Civ. No. 74-1438.**

United States District Court, D. New Jersey.

Feb. 13, 1975.

---

Robert N. Millman, Orange, N. J., for plaintiffs.

Maryanne T. Desmond, Asst. U. S. Atty., Newark, N. J., for Federal defendants.

Jack Okin, Okin & Okin, Newark, N. J., for defendants project sponsors.

## OPINION AND ORDER

BIUNNO, District Judge.

Four tenants, as representative of all the tenants in Coppergate House, East Orange, N. J., and their tenants' association, filed suit in the Superior Court of New Jersey, Chancery Division, against the landlord, East Orange Senior Citizens Housing Association (EOSCHA), as well as its managing agent, Zoephel, the Department of Housing and Urban Development (HUD), and the Federal Housing Administration (FHA).

The complaint is that a notice dated May 31, 1974 was served on all the tenants notifying them of increases in their monthly rent, to be effective July 1, 1974. It is said that as a non-profit corpora-

tion which built and operates this housing project for the elderly and handicapped with the aid of federal funds under sec. 202 of the Housing Act of 1959, 12 U.S.C. sec. 1701q et seq., EOSCHA may not increase rents without the approval of HUD/FHA. The tenants do not claim that this approval was not obtained; they object that the application, its processing and disposition were handled without their participation as parties in an adversary, hearing-type proceeding.

The tenants asked for temporary restraints, preliminary and final injunctions against the increase in rents, setting aside the approval and requiring the federal agency to grant them a full hearing on the merits of the increase. They also ask for a declaratory judgment that the federal regulations, rules, guidelines, procedures and actions violate the Fifth Amendment requirement of due process of law as well as the mandate, purpose and letter of the National Housing Act.

The complaint was filed August 30, 1974, and on the same day an Order to Show Cause, to constitute process as well (under N.J. Court Rule 4:67), was issued returnable September 27, 1974. On September 16, 1974, on petition of the federal defendants, the suit was removed here, 28 U.S.C. 1441(a).

Answer by EOSCHA and Zoephel was filed September 26, 1974. An amended complaint was filed November 4, 1974. The federal parties' answer to the Amended Complaint was filed November 8, 1974, and the Amended Answer of EOSCHA and Zoephel on November 15, 1974. Requests for admissions have been served and answered, and filed on January 8, 1975.

On January 21, 1975, the tenants filed a motion for summary judgment as to the validity of the regulations, etc., for a rebate of any rents found to have been unlawfully collected and such other relief as is just and proper.

On January 30, 1975, the federal defendants filed a cross-motion for sum-

mary judgment in their favor. EOSCHA and Zoephel have filed a like motion.

At the court's request, copies of the original agreements of rental and of the notices of increase of rental, verified by Zoephel's affidavit, have also been served and filed.

This 128 unit housing project was financed pursuant to a Loan Agreement made March 1, 1968 between the United States, through HUD, and EOSCHA. The project was located in the Doddtown Urban Renewal Project Area. The financing consisted of a loan of $1.86 million, payable in level monthly installments over a 50 year term, at 3% interest, and it is secured by a first mortgage lien on the project and improvements, as well as on the gross revenues from operation. The agreement also requires that EOSCHA, before closing, obtain an agreement from the City of East Orange for payment of 15% of the annual gross shelter rent as an annual service charge in lieu of taxes (presumably pursuant to the Senior Citizens Nonprofit Rental Housing Tax Law, N.J.P. L.1965, c. 92, NJSA 55:14I–1, et seq.).

The agreement also set out the initial monthly rates and charges authorized by HUD for the use of the dwelling units in the project, as well as requirements for the submission of an initial budget and annual budget, certified annual audit reports, and the like. Another provision explicitly states that the Loan Agreement "is not for the benefit of third parties, and the Government shall be under no obligation to any such parties."

By a separate Regulatory Agreement entered into on the same day, EOSCHA agreed to make the facilities available to eligible occupants "at charges established in accordance with a schedule to be approved in writing by the Government," and, in addition agreed that it would neither require any kind of payment or deposit of any tenant other than those for rents, utilities, collateral services and a one month's security deposit, nor accept any contribution or gratuity

as a basis for occupancy or occupancy preference. The same agreement states that "The Government shall not be liable for any of its acts hereunder except for flagrant misfeasance."

The project was completed in 1969 and rented out to applicants at that time. Initial rentals were on the basis of written leases for a one-year term, which specified the monthly rental and stated that heat, hot water, cooking gas and electricity were included in the monthly rental.

On the expiration of these one-year leases in 1970, no new leases were entered into thus converting the tenancies to an indefinite term on a month-to-month basis, N.J.S.A. 46:8–10.

Thereafter, the rentals remained unchanged from their 1969 level until the increases which are the occasion for this suit. This was made possible despite increases in costs because the loan terms called for payment of interest only (about $55,000 a year) for the period up to February 1, 1972, for "fillup" of the building, instead of both interest and amortization (about $72,000 a year). Since the building was fully occupied within 90 days, this difference allowed the accumulation of reserves of some $17,000 a year during the period to offset the additional costs.

In February, 1974, Zoephel conducted the annual general meeting between management and the tenants and informed them at that time that rents would need to be raised at the start of the next fiscal year, July 1, 1974 to meet the anticipated budget figures. They were told at that time, for example, that fuel oil had risen from 6 cents a gallon to 40 cents a gallon (it has since declined to 33 cents a gallon), and that charges for electric, gas and water, as well as other goods and services, had also risen. These increases had been widely known to the public, as electric and gas rates began to rise for the first time in some while in the latter part of 1970, and there has been wide publicity given to the many utility

rate increases that have taken effect since then. Certainly, any of the tenants who have telephone service are aware of the rises in those rates, and all must be aware of the rise in food prices and other consumer items.

EOSCHA prepared and submitted its budget for the fiscal year July 1, 1974 to June 30, 1975, including the proposed rent increases, and these were approved. On May 30, 1974, a meeting was held with the tenants, and they were informed that rent increases would be $15. a month for efficiency apartments, $17. a month for the "N" apartments, and $25. a month for the bedroom apartments. Individual written notices of the increases, effective July 1, 1974, were delivered to each tenant on May 31, 1974.

Protests to HUD ensued, especially since the percentage of increase was uneven, ranging from 15% for the efficiency apartments to 19.07% for the bedroom apartments. As a result, HUD modified its position and adjusted all the increases to 17.25%, and new notices of this adjustment were given on June 27, 1974. The proofs show that all tenants, including those who are named plaintiffs, have paid the increased rentals.

■ ■ There are several lines of decision on the question whether action of a federal agency in authorizing a publicly-financed housing project to increase rentals carries with it an obligation to provide an adjudicatory type of adversary hearing, with the tenant as a party to the proceeding.

Hahn v. Gottlieb, 430 F.2d 1243 (CA 1st–1970), Langevin v. Chenango Court, 447 F.2d 296 (CA 2d–1971), and People's Rights etc. v. Bethlehem, etc., 356 F. Supp. 407 (DC, ED Pa–1973), aff'd o.b. 487 F.2d 1395 (CA 3d–1973) exemplify the cases that say the action does not require such procedures.

Keller v. Kate, etc., 365 F.Supp. 798 (D.C., N.D.Cal.1972), and Roosevelt Village, etc., v. Lynn, (unreported) D.C.N. J. Civil No. 1751–73, exemplify the opposite view. And see, also, Blair v. Lynn (unreported), D.C.N.J. Civil No. 1412–73 (1 F.B.A. 469).

Of these two approaches, the first view is the sounder one to follow in the circumstances of the present matter. Congress has established a variety of programs to reduce housing costs for various classes of tenants, such as low-income, middle income, senior citizen and handicapped tenants. It has provided a variety of tools designed to meet the cost problem in more than one way, including direct low-cost loans, guaranteed loans, rent supplements, raises in social security benefits, and the like. No one of these programs or tools, by itself, is designed or geared to deal with more than some part of the costs or funds available, and none claims to achieve perfection in the individual case.

In some, such as the senior citizens and handicapped program involved here, the effort does succeed in freezing some components of aggregate housing costs for an extended period. Eligible borrowers must be non-profit organizations or their equivalent, so there is no cost of capital for equity, no earnings for equity and no federal income tax to support those earnings. The interest rate is well below market levels, and the amortization term is extremely long, thus bringing the annual financing costs to a minimum level. And the loan agreement here calls for freezing the payments in lieu of local real estate tax by contract with the City.

But the program here involved does not attempt to provide any means for reducing other components of aggregate housing costs. The expenses for labor and materials for repair, maintenance and supervision form one category. Insurance premiums form another. And, since water, electric, gas and heat are included in the rent, they form another category.

There is nothing to suggest that the increases are due to any influence other than a rise in costs of operation, adjustment for which was postponed while

these costs could be covered by reserves, and the cost of fuel and utility services.

Now there is nothing to say that instead of setting the rents as a fixed amount to include heat and utilities, the rent might have been set at a lower level, excluding them and having the tenants pay for their own heat and utilities, as they do for telephone service. Had that been the arrangement, the tenants' dispute would have been with the utility companies and the Organization of Petroleum Exporting Countries, which first embargoed oil production and then multiplied the price, instead of with HUD.

Much is made of the argument that in adversary, adjudicative evidentiary hearings, each tenant could provide evidence of financial means on an individual basis. The futility of this kind of approach is shown by the fact that unlike the low-income program involved in *Peoples Rights,* the senior citizens and handicapped program contains no provision for setting rents within a range between a "basic charge" and 25% of the tenant's income.

Beyond that, those tenants on social security have received increases compounded to nearly 48% since 1969 (16% on 1/1/70; 10% on 1/1/71; 4% on 9/1/72; 7% on 3/1/74; and 4% on 6/1/74). Others may be eligible for rent supplements, and still others may have income from employment. To illustrate the last item, it is shown that the plaintiff Ambrose, who claims her primary source of income to be her "fixed social security grant", is also working and earning $50 a week or about $2,500 a year, which is to be compared to her entire annual rent of $1,404., after the increase.

Yet, as noted above, the program involved here contains no provision to alter the payments to reflect the tenant's means, nor to provide the funds to meet the costs not covered by the rents.

Whatever else may be said about the program, it does provide that the borrowed money be repaid with interest.

The terms are very favorable, and in the aggregate they do provide to the senior citizens and the handicapped the kind of mortgage loan terms that they could not obtain in the open market. This is as far as the program purports to go, with further support from the contractual obligation to secure the benefit of local tax stability. Hearings by HUD/FHA can accomplish nothing in terms of rates for water, electric, gas or fuel oil. The tenants can participate in the regulatory hearings by the Public Utility Commission, and market prices for fuel oil are widely published but not regulated at the retail level.

For all these reasons, it is concluded that the plaintiffs' motion for summary judgment must be denied, and the corresponding motions by the defendants granted.

The long-term effect of this disposition in no way affects future rents and proceedings. The supervisory function here is exercised by HUD/FHA through the review of annual budgets before the fact and of certified annual audit reports after the fact. Since there is no equity interest or retained earnings to absorb fluctuations in costs and revenues, and no interest-coverage multiple for like purposes, the non-profit corporation must make use of reserve funds to achieve the purpose. To the extent that actual experience, as reflected by the certified audit reports, discloses that the actual revenues were more than needed to meet actual expense, the overrun can easily be corrected in the ensuing budget by appropriate adjustment to the rents. This approach is probably the only feasible and practical one for the supervision and regulation of a non-profit project. It is closely analogous to the method by which many kinds of insurance, such as automobile and workmen's compensation, are funded by premiums calculated on a conservative basis to assure the ability to pay claims and expenses, with adjustments after the fact in the light of experience by a return of part of the premium (usually misnamed a "dividend").

Beyond that, and following the statutory construction of a different statute in Thompson v. Washington, 497 F.2d 626 (CA. DC–1973), and in Marshall v. Lynn, 497 F.2d 643 (CA. DC–1973), HUD has promulgated new procedures on a prospective basis, published in 39 F.Register 32736. These call for notice to tenants of any intent to seek approval of rent increases, an opportunity to submit written comments, and a statement of the reasons for approval or disapproval of the request. See Paulsen v. Coachlight, etc., 507 F.2d 401 (CA. 6th–1974). These regulations will .accomplish in more formal fashion the same end that was accomplished by informal procedures here.

The foregoing opinion constitutes the court's findings of fact and conclusions of law.

So ordered. No costs.