Barbara GLASCO et al., Plaintiffs,

v.

Carla HILLS, Individually and as Secretary
of the U. S. Department of Housing and
Urban Development, et al., Defendants.

Civ. No. 75-1007.

United States District Court,
D. New Jersey.

Feb. 24, 1976.

Supplemental Opinion April 26, 1976.

Bernard K. Freamon, Newark, N. J., for plaintiffs.

Carolyn E. Arch, Asst. U. S. Atty., Jonathan L. Goldstein, U. S. Atty., Newark, N. J., for federal defendants.

Hilton Davis, Newark, N. J., for defendants Newark Community Housing Corp. and Booker Realty Management Corp.

BIUNNO, District Judge.

The present application is for a preliminary injunction to restrain the collection of rents authorized by the federal agency which regulates the rentals on housing projects financed under the federal housing program.

One of the arguments is that federal law on the subject does not preempt the field, leaving the City of Newark free to also regulate rents under the local ordinance. Since both sets of regulations take the form of setting maximums, the effect of this posture would be to set the maximum rent at the lower of the two maximums.

The history of rent control in the United States is a spotty and irregular one, more so than for price regulation as such. There has never been any general recognition of a justification for rent control in the last half century except during World War II, which saw a nationwide system of economic controls at the national level to regulate and control all prices, including wages and rents as well as commodities and services, along

with rationing of commodities felt to be subject to the risk of short supply, such as meat, butter, gasoline and fuel oil.

Since World War II there has been very little in the way of similar economic regulation, the general policy choice being that the competitive private enterprise system traditional here yields more acceptable results for the system as a whole over the long run than do systems of detailed regulation. Part of the reason for this attitude no doubt resides in a recognition of the fact that unless substantially all significant areas of economic activity are brought within the control system, the goals of regulation will be frustrated by the existence, side by side, of several sets of markets, some regulated and others not. Another factor, of course, is the massive administrative workload which any general economic control system engenders, along with the considerable costs for manpower and supplies which accompany it. These costs and this expenditure of manpower produce no usable commodity or service; they are unproductive; they add nothing to the gross national product.

Of course, this is not to say that there are no areas of economic regulation. There are such areas. Perhaps the oldest such area is that of the public utilities, whether they be for rail, bus and motor, air or vessel transportation, or for electric, gas, water, sewerage or telephone services. But these are vastly different in character from rent control. These categories are based on the notion that the capital costs of setting up to render the service are so high that the economy cannot afford to take the risk of financial collapse of an enterprise due to competition. The policy decision here is to grant limited monopolies—monopolies being the potentially most efficient form of economic endeavor—and to superimpose regulation as a substitute for competition.

Another area of control, quite unique, is that of milk price control. Here the object is to protect the producer, processor and supplier of milk against the risk of price declines due to cyclical oversupply, which if allowed to occur would drive some inefficient producers out of business and thus reduce the productive capacity for turning out what is thought to be an essential food. The economic control here takes the form of establishing a minimum, rather than a maximum, price.

In New Jersey, minimum prices for cigarettes and posted prices for gasoline are set to protect the State's revenue from the taxation of these commodities against diversion, and posted minimum prices for alcoholic beverages are set to avoid encouraging their undue consumption.

In Europe, perhaps the most widely known instance of rent control is that of Paris, and many volumes have been written about it by many scholars, the consensus of which evidently is that rent control there has failed to achieve its purposes because of the effect it has had in destroying any motive to add to the supply of housing.

In this country, the most extensive system of post-war rent control probably has been in New York City. There, the system is one of a dual market, with rent controls applied to existing housing but not to new housing. This has had the effect that anyone familiar with the subject would predict, namely that the private new housing is aimed at tenants in a high economic bracket. The inevitable result is an ample supply of new luxury housing, leaving it to government projects to provide financing for middle income and low income housing. The inability of the governmental agencies to meet their overextended financial obligations, supposedly to be met from revenues of operation, has contributed to the financial disaster experienced by both the City and State of New York, with incidental adverse impact on the financial capacity of all other State and local governments and agencies throughout the country.

At the national level, the effort in respect to housing has taken various forms. Most of them have approached the problem from the standpoint of financing the construction of housing. For that segment of the market that includes owner-occupied housing, the federal government provides guaran-

tees of mortgage loans through FHA and VA. Four economic elements are involved here: loan amounts at much higher proportion of the value of the property than are available on a prudent, conventional mortgage; lower interest rates than the money market conditions would command for comparable risk; longer amortization schedules (and hence lower monthly payments); and a guarantee of full payment to the lender in the event of default.

Aside from providing economic support of this kind at the consumer end, which helps provide means to satisfy the demand and thus stimulates construction, which in turn enlarges the supply, the federal programs have also attacked the problem more directly from the supply end. This has taken several forms, which may be used alone or in combination. One form involves the making of grants to help meet the cost to a local government agency (usually a housing authority) to acquire title to badly run-down areas of a city, to demolish the buildings, clear the area and prepare the site for redevelopment construction. This makes available at feasible cost land that would otherwise be so expensive as to foreclose the likelihood of privately financed clearance and redevelopment.

Another form consists of making available loans, or guarantees of loans, with very long amortization terms either at interest rates far below going market levels or with payments to so reduce the net interest rates as to provide financing otherwise wholly unavailable to meet construction costs. These devices serve to stimulate construction and thus add to the supply. Finally, and more recently, it has provided rent supplements to help individual occupants to meet the market price of available housing. This device functions by increasing the number of individuals who can meet the price, thereby increasing the demand and hopefully stimulating the provision of supply by maintaining the prices that will attract capital. *See, e. g., Coppergate v. Lynn,* 391 F.Supp. 821 (D.C.N.J.1975).

The programs have had varying degrees of success, with the experience with Pruitt-Igoe in St. Louis being the example of complete disaster.

None of these methods purports or attempts to attack the problem of housing supply, demand or price directly. All attempt to deal with some aspect of the economic relation on a long-term basis in some way that is intended and designed to moderate the problem.

Whatever the effective value of the existing methods may be on a long-term basis, they are essentially ineffective in a period of economic upheaval such as has existed since about late 1969, when interest rates began to rise. Since then, they have reached historic highs (about August or September of 1974) and the economic scene has been compounded by double-digit inflation, a decline in economic activity and an eruption in the cost of petroleum-based products generated by the quadrupling (or more) of the price of petroleum from the OPEC nations.

In the traditional sense, there is not and has not been a true housing shortage since the end of World War II. The war period, during which no housing construction was allowed, saw a housing shortage of the traditional, physical type. Growing families were obliged to double up. Attics, basements and garages were converted to housing space. Single-family homes were converted into multiple family homes or rooming houses. Nothing of that sort appears on the current scene.

The nature and pattern of the so-called housing shortage today has entirely different characteristics. In the sunshine belt, which encompasses the southern segment of the continental United States from Florida to California, there are hundreds of thousands of housing units completed or under construction for which there are no buyers or tenants, even though there is a strong population shift to that area. REIT's are experiencing financial collapse by the score.

In that area, there is neither a shortage of housing nor a shortage of interested buyers. The difficulty is that the prices are so high that the interested buyers will not

buy. There is therefore the paradox that there is both an adequate supply and a corresponding demand, yet there are no sale or rental transactions because the commodity is priced out of the market. In the normal operation of a free market, what occurs under such conditions is that the supplier must take a loss, including out right bankruptcy if need be. This mechanism will usually work for consumable commodities and services. But in the case of capital commodities which also have an operating expense for their use and enjoyment, it will not work if the combination of a distress price for the capital commodity, added to the operating costs, is still priced too high for the market. That is precisely what is going on now.

Rising real estate taxes, rising costs for space heating, rising costs for lighting and cooking, rising costs for water and sewerage, have reached levels at which the cost of operation can exceed the cost of the housing space itself.

Whether owner-occupied or rented, housing has a number of components going into its annual cost. One is return on the investment, part of which may be represented by interest on the mortgage. Another is depreciation and obsolescence—housing is a wasting asset. Maintenance and repair, which includes periodic painting, is another component. Operating services, such as electric, gas, heating fuel, water and sewerage form another component. Real property taxes form still another component. And unlike some other forms of economic activity housing has little, if any means for moderating costs through productivity gains or the economies of scale.

The cost of occupying an owner-occupied home, or of renting an apartment, is the result of all these components, over which there is little, if any, control.

Consequently, the regulation of rents is both a sophisticated and delicate affair, both because of the lack of control over the components of cost and because of the high risk of a flight of capital if the level is set too low. The latter aspect, of course, only aggravates the problem.

In New Jersey, the history has been clear. In the post World War II era, bills for rent control systems of one kind or another have been introduced regularly and none has been able to command support approaching a majority of both Houses, at least since the expiration of L.1953, c. 216 (a limited statute). It was not until 1973, when a rent control ordinance of Fort Lee was held to be within the general powers of a municipality to enact, that there was any potentially permanent form of rent control in the State since the end of World War II. *Inganamort v. Fort Lee*, 62 N.J. 521, 303 A.2d 298 (1973). The pattern in the Legislature appears to be that there is a strong minority in favor of such legislation and a strong minority opposed to it, with neither side able to command a majority. Municipal officials, being subject to different economic constituencies, have shown a greater receptiveness to rent control, subject to the degrading effect it has on the ratables base for the real estate tax.

In the early 1970's the emergency economic controls established at the national level to attempt to combat strong inflationary forces through control of costs and encouragement of productivity gains did include limited forms of rent control. With the termination of most of that program, the effort to control rents was taken up at the municipal level and led to the holding, for the first time in New Jersey, that the municipal delegated authority included the enactment of rent control ordinances. *Inganamort*, supra. But see, especially, the dissenting opinion of *Conford*, P.J.A.D.T.A., 62 N.J. at 538–546, 303 A.2d 298.

That much having been decided, constitutional challenges to the specific ordinances of a number of municipalities followed, and the first rulings by the Supreme Court of New Jersey were handed down in December of 1975. These cases were *Hutton Park*, 68 N.J. 543, 350 A.2d 1; *Brunetti*, 68 N.J. 576, 350 A.2d 19; and *Troy Hills*, 68 N.J. 604, 350 A.2d 34.

In all three cases, various challenges to the group of ordinances involved were found not to have been sustained on the

face of the ordinances. The results arrived at appear to have rested on slender grounds. It was said, with some kindness, that the ordinances "are not models of careful draftsmanship" (68 N.J. at 573, 350 A.2d at 17), and, because all of the ordinances evidently failed to contain appropriate provisions to that end, that "every" such ordinance "must be deemed to intend, and will be so read", to permit owners to apply for increases on the ground that they are entitled to a "just and reasonable rate of return" (68 N.J. 572, 350 A.2d 16).

In all the cases, the court made no ruling on the constitutionality of any of the ordinances as applied to a particular owner, either because the record lacked the data on which to evaluate the rate of return, or because the administrative remedy through application to the local board (not in the ordinances but added by the court) had not been exhausted. And it is indicated that the economic unit to be employed for this purpose is the "individually administered apartment complex" (68 N.J. at 627, 350 A.2d 34), while challenges to unworkability were left open for lack of an adequate record and the absence of findings at the trial level (68 N.J. at 599, 350 A.2d 19).

The court's hope for legislative adoption of a uniform enabling act (68 N.J. at 573, 350 A.2d 1), is probably forlorn. The sustaining of the validity of the defectively drawn ordinance is more likely to reduce pressures on the Legislature to enact anything, while the court's own division on the standards of measurement will doubtless be reflected in a legislative inability to agree on some "uniform" methodology.

The Newark ordinance, involved here, was not before the Supreme Court of New Jersey in any of the cases mentioned, and none of the parties has indicated to the court whether any case involving it is on its way there. But even if it were, the likelihood is that it would not address the constitutionality of the ordinance as applied, because it is only since the court adopted the saving construction on the point on December 11, 1975, that an owner has been able to apply for an increase on the ground that he is entitled to a just and reasonable rate of return.

Nor does any New Jersey case deal with the very different question now posed, namely, whether a municipal ordinance may regulate the rents for a housing project whose rents are already subject to federal regulation, as they are here, except for what appears to be a decision, unreported at this stage, in the Atlantic City District Court, *Bruche Corporation v. Dorn.* The docket number in that court is T 41/17.

■ The record presented on the motion for preliminary injunction is too incomplete for a final ruling on that point. But what has been presented is sufficient to indicate that the likelihood of plaintiffs' eventual success is remote, so that one of the essential showings to the grant of a preliminary injunction is lacking.

It is sufficient for this purpose to consider only some of the arguments presented, leaving the others for later disposition on a full record.

One aspect noted here is the matter of preemption. Federal law has not preempted the entire field of rent control; but so far as pertinent here it has set up a system of rent controls as part and parcel of each federal housing project as an integrated ingredient of the program. As the law of New Jersey itself recognizes, a subordinate law such as a local ordinance, which contradicts an established federal policy, must fall. The test is whether it permits what federal policy forbids, or forbids what federal policy expressly authorizes. *Summer v. Teaneck,* 53 N.J. 548, at 554–555, 251 A.2d 761 (1969). Thus here, if federal law authorizes an increase of $15 a month, Newark may not limit the increase to $10 a month. And if the Newark ordinance allowed an increase of $15 a month, it would lack force in the face of federal authority limiting the increase to $10 a month. The conflict is clear and obvious, and the specific field of rent control has been preempted by the federal government for those projects where its law regulates the rents.

The second aspect arises from the fact that in a case of this kind there is a direct federal interest, not only in the regulation of rents but also in the financing of the project. It has either loaned the mortgage funds, or insured the mortgage funds, and has either set a nominal interest rate or undertaken to pay the difference between such a rate and the actual rate. It has required, for some programs, that the owner be an organization not for profit. It has required, for some programs, that there be a contract with the municipality to make payments at some authorized level, as a percentage of rents, in lieu of local real estate taxes for the life of the mortgage loan. It has geared the rentals, for some programs, to some percentage of the tenant's income, and in others provides rent supplements to the tenant.

These programs are administered on a national basis, and to allow local law to interfere with that administration or to risk the ability of the federal government to recover its mortgage loan or to increase its exposure to liability on insured mortgages is to strike at the federal government itself. The supremacy clause, Article VI of the Constitution of the United States, forbids any such result. The principle is well established in related areas. *See*, for example, *Clearfield Trust v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943); *United States v. Allegheny Co.*, 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209 (1944); *United States v. Standard Oil Co.*, 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067 (1947); *Clark, etc. v. United States*, 364 F.2d 7 (C.A.9, 1966); *United States v. Caprice* 3 FBA Opinions 237 (D.C.N.J.1974).

And the suggestion, particularly in *Troy Hills*, supra, that the measure of a just and reasonable rate of return is to be made by the methods applied to public utilities underscores the horrendous costs that would be incurred and the will-o'-the-wisp nature of the local remedy. See, especially, the concurring opinion of Conford, P.J.A.D. T.A.; joined in by Clifford, J., 68 N.J. at 634–635, 350 A.2d 34.

The court notes that some of the private defendants had failed to file answer within time, and that a default had been entered against them. But the real party in interest among the defendants is the United States, whose interests are directly at stake, and it is not in default. Also, plaintiffs have consented to entry of an order setting aside the default and setting a time to answer.

Plaintiffs have also applied to file a supplemental complaint to plead the events that have occurred since the suit began. That motion is granted. The new pleading is to be a completely revised complaint, embracing the original one as well as the supplemental matter, so that no further reference need be made to the original pleading, but the allegation of supplemental facts shall be designated by a asterisk after the paragraph number. It shall be served and filed on or before April 1, 1976, and answers will be due according to the usual time allowed.

The motion for preliminary injunction is denied. The denial is without prejudice. Should a further application be made, and should a case for its issuance be established, the plaintiffs are put on notice now that the application must include a tender of security, as required by F.R.Civ.P. 65, in an amount sufficient to cover that part of the rental as is in dispute. To avoid frustration of the purpose of the security, payment to an entity in the control of plaintiffs will not be approved. *See*, for example, *In re Callan*, 122 N.J.Super. 479, 300 A.2d 868 (Ch. 1973), aff'd., 126 N.J.Super. 103, 312 A.2d 881 (App.1973), rev'd, 66 N.J. 401, 331 A.2d 612 (1975).

On any such application, if the United States can satisfy the court of its authority to do so, the court is inclined to direct payment of the disputed rentals directly to a designated agency of the United States for credit against payments due on the mortgage for interest and amortization, in lieu of payment into court. But plaintiffs are entitled to be assured that, if they ultimately prevail, the court will be able to

compel repayment of any excess to them by the United States without condition, exception or delay, and without dependence on the enactment by Congress of an appropriation for that purpose.

## SUPPLEMENTAL OPINION

### (Decided April 26, 1976)

Since the ruling made at the hearing of February 23, 1976, plaintiffs filed a Supplemental Complaint on April 1, 1976 and have filed a further motion for preliminary injunction. Also, the City of Newark and its Rent Control Board have filed motion for leave to intervene as party plaintiffs.

## MOTION OF CITY OF NEWARK AND BOARD TO INTERVENE AS PLAINTIFFS

No papers in opposition to this motion have been filed, and the United States has informed the court that the federal officials named have no objection to intervention.

This case involves the Newark Rent Control Ordinances, No. 6S and FB, adopted December 20, 1973, effective from November 1, 1973, and No. 6S and Fa, adopted July 18, 1974, which amends the first ordinance in various respects and provides for its expiration on October 30, 1976 unless specifically extended by resolution of the Municipal Council for consecutive periods of 3 years, each extension to be adopted before the expiration date then in effect. The crucial issue here is whether the 1973 ordinance and the 1974 amendments have any force in regard to the federally financed project involved; i. e., is there federal pre-emption in the regulation of rents?

At this stage of the case, the question of pre-emption has come up as one of the issues of law, perhaps the main one, in the case. No answers have yet been filed to the supplemental complaint, and there is no way of predicting whether some defendant will make any direct attack on the validity of the Newark ordinance as applied to a federally financed project. Nor is there any clear indication whether the court has any jurisdiction over such an attack. Those issues will need to await the completion of the pleadings and the final definition of issues at the pre-trial conference.

Until the matter of the status of the City of Newark can be determined more confidently, its intervention will be allowed in the capacity of *amicus curiae.* After the answers are in and the point briefed, the status or capacity of the intervention can be considered anew.

When an action involves the enforcement, operation or execution of State statutes or administrative orders, at least 5 days' notice must be given to the Governor and attorney general of the hearing on application for injunction, 28 U.S.C. § 2284(2). Local Rule 32 calls for notification to the judge in any case where the constitutionality of an Act of Congress is drawn in question, presumably so that similar notice may be given to the clerk under 28 U.S.C. § 2284(2). No similar provision exists where an injunction is not sought, or when a municipal ordinance is involved.

Considerations of comity and of aid to the judicial process warrant intervention as *amicus curiae,* and an order to that end will be entered.

The City of Newark is directed to submit a preliminary brief on or before May 31, 1976, on the points listed below, and any others it considers pertinent:

1. Whether the Newark ordinances in fact apply to the subject "dwelling", known as Hill Manor Apartments, in view of the provision, in § 2(b), that: "Public housing . . . [is] exempted from this ordinance," and, if claimed to apply, a description of the "public housing" exempted.

2. Whether the ordinances apply to single family dwellings.

3. The basis for exclusion from the ordinance of owner occupied 2 and 3 family housing space [§ 2(b)].

4. The basis for the determination that demands for increases in rent are "exhorbitant, speculative and unwarranted" (§ 1–A).

5. Whether the ordinance applies to dwellings other than housing accommoda-

tions for families of "low and moderate income." (§ 1–B).

6. The basis for limiting the tax surcharge payable by a tenant to the tenant's percentage of the entire rent roll including unoccupied units (§ 5).

7. Same as # 6, in regard to capital improvement surcharges, § 8.

8. Whether § 9 is to be read as allowing an application for increase sufficient to provide a "just and reasonable rate of return", as stated in *Hutton Park*, 68 N.J. at 572, 350 A.2d at 16, without limiting the expenses considered to those for maintenance, financing and repairs.

9. Same as # 6 in regard to hardship increases under § 9.

10. The current recognized level for a "just and reasonable rate of return"; whether the same is applied to the entire capital investment or only to equity capital; and the basis for each in light of current levels for long-term investments in AAA bonds and high-quality equities.

11. The basis for the exemption from the ordinance of the "initial rent" charged for housing space or dwellings (old or new) when rented for the first time, and for dwellings substantially reconstructed or rehabilitated at a cost exceeding 50% of the undepreciated cost or fair market value before reconstruction, and whether such "undepreciated cost" or "fair market value" refers to depreciable assets only, or also includes land cost or value. (§ 17).

12. Whether the Rent Control Board has adopted rules and regulations, and whether any have been approved by ordinance [§ 10(c)]; if so, authentic copies are to be furnished to all parties and to the court.

13. What means, methods or controls are provided to protect against the risk of bias or prejudice in favor of economic constituencies (discussed below) on the part of the Rent Control Board.

14. The statutory authority for § 14 (assuming that it refers to judicial proceedings).

15. The statutory authority for § 15.

16. The statutory authority for § 18.

17. The statutory authority to extend the life of the ordinance by resolution (§ 21).

18. What means, methods and procedures have been provided to assure workability (see *Brunetti*, 68 N.J. at 599, 350 A.2d 19), particularly since the economic unit must be the "individually administered apartment complex" (see *Troy Hills*, 68 N.J. at 627, 350 A.2d 34), and in light of the direction that the measurement of a just and reasonable rate of return is to be made by methods akin to those applied to public utilities (see *Troy Hills*, 68 N.J. at 622–630, 350 A.2d 34).

19. Whether any rent increase that does no more than pass through an actual dollar cost increase (i. e., for fuel, gas, electric, etc.) will inevitably reduce the owner's rate of return.

20. Does the ordinance, or the rules and regulations, or any policy of the Rent Control Board contemplate the inclusion, in the calculation of regulated rents, of any component for reserves to provide cash to meet unforeseen contingencies in the case of apartment complexes owned by a non-profit corporation, in which case there would be no equity and no accumulated earnings available for that purpose.

21. Does the City of Newark have in contemplation, in preparation or in process a new rent levelling ordinance, or amendments to the present ordinance, for the purpose of achieving the norms and standards declared to be necessary by the Supreme Court of New Jersey to assure the constitutional validity of the ordinance (aside from the pre-emption and related questions), as expressed in *Hutton Park*, 68 N.J. 543, 350 A.2d 1 (1975); *Brunetti*, 68 N.J. 576, 350 A.2d 19 (1975) and *Troy Hills*, 68 N.J. 604, 350 A.2d 34 (1975). If so, state the current status and forecast of expected adoption.

■ To the extent that the motion to intervene includes the Rent Control Board itself, it is denied. The ordinance discloses

that the Board is an administrative body charged with executing the ordinance and achieving its purposes. It decides on applications for increase or decrease as between owners and tenants. In that capacity its interest is necessarily an impartial one, and it has neither standing nor interest for intervention here.

## THE MOTION FOR PRELIMINARY INJUNCTION

This motion is by plaintiffs, including the City of Newark as *amicus curiae,* which joins in Points I and II of the moving brief. The federal defendants have filed an answering affidavit, with exhibits, and briefing material in opposition.

The motion is a narrow and restricted one: it seeks an order "enjoining the enforcement of 24 C.F.R. 403.5 and 24 C.F.R. 403.6", pending final hearing on the supplemental complaint. These regulations, which became final on October 22, 1975, explicitly state a policy of pre-emption over local law in regard to rent control of specified types of federal housing projects, including this one.

Although the original complaint did not, and could not challenge these regulations (which had not then been adopted), the regulations were in existence at the hearing of February 24, 1976 and argument was addressed to them at that time, and was considered.

The denial of the preliminary injunction at the hearing of February 24, 1976 was arrived at on grounds that do not depend on the validity of these regulations. Consequently, the present motion is merely a formal challenge to the regulations now that they have been explicitly attacked by the added material in the supplemental complaint. Their "enforcement" is not a rational subject for restraint by injunction.

The present motion, in substance, is no more than an attempt to seek reargument or reconsideration of the previous denial, formally embodied in a separate order dated February 26, 1976. As such, it is far beyond the 14 day period fixed by Local Rule 12–I for that purpose, and it is accordingly, denied.

It was also noted in the earlier opinion that any fresh application, with a case made for issuance of an injunction, would have to be accompanied by a tender of security as required by F.R.Civ.P. 65, sufficient to cover that part of the rentals as is in dispute, and guidelines were stated for the methods that the court would consider acceptable. No such tender is included in the present motion.

So much having been said and decided, it may be helpful to the parties to outline some initial impressions and references that should be noted.

An exhaustive press review of what is happening in this field was published March 7, 1976 in the N. Y. Times, p. 1, col. 2, continued on p. 37. In the New Jersey section of the same issue, there was an account of issues developing here. And, in the N. Y. Times Magazine of April 18, 1976, p. 19, there is published an analysis of rent control by Mr. B. Bruce Briggs, an urbanologist with the Hudson Institute, expressing one point of view.

These press accounts are mentioned, not because they are evidence in the case (which they are not), or argument to be considered (which they are not). They are mentioned because they are current and serve the potential function of directing the attention of the parties to the various aspects of the subject as a whole, and thereby may assist them in adducing evidence and presenting argument.

It was in that spirit that the court, during argument on February 24, 1976, called attention to the published paper of Attorney General Hyland in "Criminal Justice Quarterly", issue of April, 1975, dealing with the importance of combatting official corruption, a matter of grave concern to all persons. This was mentioned in context with the concern expressed by Judge Conford in *Inganamort,* 62 N.J. at 538–546, 303 A.2d 298 (1973), dissenting opinion. His concern was for the disorder that municipal rent control runs the risk of generating,

particularly in the urban counties, with different systems and different formulas from one municipality to the next, some being only a few square miles in size. In addition to this there is the difficulty posed by the direction given in *Troy Hills, supra,* that a methodology akin to that of public utility rate cases is to be employed.

All of these factors were expressed, in the colloquy, as generating an increased risk of subtle forms of official corruption in the contest either to obtain an increase or to block one, through the creation of a large number of agencies to deal with granting or denying authority for the payment of money. The risk is that of creating economic constituencies whose votes in the electoral process might be bought with the grant or denial of someone else's money, public or private. The injection of public utility rate concepts seems likely to magnify the risk because of the complexity and expense of that process, especially when the economic unit to which the process must be applied under *Troy Hills* is the "individually administered apartment complex," such as Hill Manor Apartments here.

The risk can take several forms. One is where the increase at issue is a small one, and the owner's cost of securing it (including judicial proceedings) involves a substantial sum. Since the expense of securing the increase is a cost of doing business, it will compel the authorization of a still greater increase if, as New Jersey has ruled, the end result is to be a just and reasonable rate of return. Second, the structure of the Board under the Newark ordinance seems to invite the risk of making determinations to favor one or another economic constituency.

Section 10 establishes a Board of 5 members to be appointed by the Mayor and approved by the Council. Of the 5, 2 are to be tenants, 2 are to be landlords, and the fifth is to be a law school graduate. Section 10(e) sets a quorum at 3, and requires a vote of 3 for Board action. If the tenant and landlord members vote in ways that favor the constituencies they represent, Board action could, in practical effect, be controlled solely by the law school graduate. And if that key member should have hopes or aspirations to hold public office, he may be led to favor one side or the other, depending on which he conceives to be his stronger constituency.

This is not to suggest that the Board members will not discharge their duties other than honestly, faithfully and impartially. But the risk of conflict, and the appearance of impropriety are invited by the structure. Parties in interest should be heard fully, but the process risks degradation when they take part in the decision. Plaintiffs and defendants do not sit on their own juries.

Obviously, the present ordinance as amended in 1974 could not have foreseen the details spelled out by the Supreme Court in the 1975 trilogy. A new ordinance drafted in the light of those decisions may well meet these problems effectively. It is too early to tell, and this case may or may not prove to be the proper vehicle for considering that question.

Also, it should be noted that as long ago as 1967, New Jersey recognized the vital importance of protecting the integrity of mortgage loans made for redevelopment, renewal and rehabilitation projects (which include low income and middle income housing projects) by the enactment of L.1967, c. 304, N.J.S.A. 55:17–1 to 11.

It assures that the terms of any lease or financial arrangement made as one of the elements counted on in launching such a project are to continue in full force and effect despite default in or foreclosure of any mortgage loan made to finance the project, and provides other additional and supplemental remedies for such mortgage loans.

Contracts for mortgage loans (i. e., mortgage loan commitments) as well as the notes or bonds and the mortgages themselves, when made on or after the effective date of the Act on February 15, 1968, come within the protection of N.J.Const. Art. 4, § 7, par. 3. That provision goes beyond its parallel in the U. S. Constitution in that it not only forbids laws impairing the obliga-

tion of contracts but also those "depriving a party of any remedy for enforcing a contract which existed when the contract was made."

The introducer's statement to the bill took note that without such protection, revenue bonds to be issued by various State or local agencies to finance the construction of such projects, including housing projects, might well be unmarketable and this would naturally frustrate the underlying objective to provide public support for private financing of such projects.

The arrangements with the United States in regard to Hill Manor Apartments may well come within this statute, by reason of the definition in NJSA 55:17–9(b). It is also observed that as published, NJSA 55:17–9(d) omits a phrase or phrases as the sentence of the definition is incomplete.

The point has not been briefed, but it may well be that this statute, especially when considered with the rule expressed in *Summer v. Teaneck,* 53 N.J. 548, at 554–555, 251 A.2d 761 (1969), and the constitutional provision mentioned, expresses a policy of local law which itself carves out and excludes from municipal rent control ordinances those projects coming within its terms. If this were so, then the federal questions of pre-emption and the like may not need to be decided.

In any event, the present posture of the case is no different than it was at the February 24, 1976 hearing, and the decision then made will stand.

The nature of the case is such as to lend itself for final determination on the basis of facts not in dispute. After the City's brief and the answers to the supplemental complaint are in, a pretrial conference will make that evaluation possible. The defendants are urged to serve and file their answers as soon as feasible so that the matter may be expedited.